S INDUSTRIES, INC., Plaintiff,

v.

STONE AGE EQUIPMENT, INC., d/b/a Five Ten, d/b/a 5.10; Recreational Equipment, Inc., d/b/a REI; Erehwon Mountain Outfitters, Inc., Defendants.[1]

No. 96 C 4951.

United States District Court,
N.D. Illinois,
Eastern Division.

June 23, 1998.

1. Plaintiff originally named three other companies as defendants in this action: The North Face, Uncle Dan's Ltd., and Active Endeavors. A consent judgement was entered against Uncle Dan's on October 17, 1996; The North Face and Active Endeavors were dismissed by agreement of the parties.

John C. Valas, Chicago, IL, for Plaintiff.

Philip M. Kolehmainen, Joseph Krieger, Joan Pennington, Mason, Kolehmainen, Rathburn & Wyss, Chicago, IL, Theodore A. Pianko, Jeffrey A. Fehervari, Marilyn R. Khorsandi, Christie, Parker & Hale, Pasadena, CA, for Defendants.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

This lawsuit presents serious issues about the ethics of the plaintiff's principal and his counsel. "S Industries, Inc. . . . appears to have entered into a new industry—that of instituting federal litigation." *S Indus., Inc. v. Hobbico, Inc.,* 940 F.Supp. 210, 211 (N.D.Ill.1996) (Shadur, J.). To this we might add litigation lacking in merit and approaching harassment. Of the five merits-related decisions spawned by S Industries' ("SI") 1996 trademark litigation siege, three have entered summary judgment against SI and two have seriously questioned the validity of SI's complaints.[2] Our decision continues in

2. See *S Industries, Inc. v. Centra 2000, Inc.,* 1998 WL 157067 (N.D.Ill. Mar.31, 1998) (granting summary judgment against SI); *S Indus., Inc. v. GMI Holdings, Inc.,* 1998 WL 67627 (N.D.Ill. Jan.30, 1998) (granting summary judgment against SI); *S Indus., Inc. v. Diamond Multimedia Sys., Inc.,* 991 F.Supp. 1012 (N.D.Ill.1998) (granting summary judgment against SI); *S Indus., Inc. v. Hobbico, Inc.,* 940 F.Supp. 210 (N.D.Ill.1996) (doubting SI's ability to state a claim); *S Indus., Inc. v. Kimberly–Clark Corp.,* 1996 WL 388427 (N.D.Ill. July 9, 1996) (same). Judge Shadur described the latter two suits as "hav[ing] the hallmark of a lawyer-inspired lawsuit of dubious merit," then ordered SI's attorney to show cause why the complaints satisfied the requirements of Fed.R.Civ.P. 11(b). See 940 F.Supp. at 212–13, 1996 WL 388427, at *1. On the flip side, a federal judge in Connecticut found SI culpable of infringing a trademark owned by Timex, awarding Timex treble damages and reasonable attorneys' fees. See *Timex Corp. v. Stoller,* 961 F.Supp. 374, 379–80 (D.Conn.1997). The case was later settled during SI's appeal.

Under these circumstances, the Court deems it appropriate, if not critical, to publish this opinion despite the parties' practice of filing nearly every document under seal under the guise of complying with the stipulated Protective Order entered in April 1997. Any material that the Order defines as "confidential" is either (1) irrelevant and not discussed in this opinion; (2) does not meet Rule 26(c)'s requirements for protection from disclosure; or (3) has already been revealed in other federal court decisions of public record. As the Seventh Circuit aptly observed, "the common law right of access creates a 'strong presumption' in favor of public access to materials submitted as evidence in open court . . . the public's right to inspect judicial documents may not be evaded by the wholesale sealing of court papers." *United States v. Corbitt,* 879 F.2d 224, 228 (7th Cir.1989) (citations omitted). This is not to say that the sealed documents will become public record; it simply means that we are publishing an opinion that addresses motions supported by documents filed under seal.

this vein, and thus signifies a continuing pattern of bad faith litigation by SI, who has been represented by the same counsel in each case.

This suit stems from SI's claim that it owns the trademark STEALTH for use on various sporting goods and equipment and on athletic shoes and boots. SI contends that defendant Stone Age Equipment's (denoted here as "Five Ten") use ·of STEALTH on rubber soles for rock-climbing shoes and water-terrain navigation boots (think fly-fishing) infringes these trademarks; defendants REI and Erehwon allegedly infringed SI's marks by selling Five Ten's STEALTH-soled products. SI asserts several offenses based on this conduct: infringement of a registered trademark under the Lanham Act, 15 U.S.C. § 1114 (Count I); unfair competition and false designation of origin under the Lanham Act, 15 U.S.C. 1125 (Counts II and III); and violations of the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS 505/1 et seq., and the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq. (Count IV).[3]

But this Court's exhaustive review of the pleadings and rather voluminous record demonstrates a striking absence of proof supporting these claims—most notably, SI's failure to produce any evidence permitting a reasonable jury to find that a STEALTH shoe ever existed, much less reached the public—frequent misrepresentations of the evidence and unsupported legal arguments. Consequently, on the cross-motions for summary· judgment before us, we rule for the defendants and against SI. We also award the defendants reasonable attorneys' fees and defense costs as prevailing parties, see 15 U.S.C. § 1117(a) and 815 ILCS 505/10a(c), finding that this is just the type of suit that the Seventh Circuit would deem "oppressive."

See Door Sys., Inc. v. Pro–Line Door Sys., Inc., 126 F.3d 1028, 1031–32 (7th Cir.1997).

## RELEVANT FACTS [4]

### A. Leo Stoller and His Companies

SI is in the business of assisting its affiliated companies in importing, marketing, distributing and selling a wide variety of consumer goods, some of which bear the STEALTH trademark. Its current President, CEO and sole shareholder is Leo Stoller. Stoller, who began doing business in 1981 as the sole proprietorship Sentra Sporting Goods, U.S.A., incorporated SI in 1985 and founded its affiliated entities around the same time: Sentra Industries (incorporated in 1984), Stealth Industries (1984), and Chestnut Industries (1985) (collectively the "Stoller companies"). All are based in Illinois.

Stoller claims that Sentra Sporting Goods, U.S.A. was the first to use the STEALTH mark "as a trade name, 'house' mark, service mark and trademark" on consumer goods— including sporting goods and, allegedly, athletic shoes—and that, through various intercompany license agreements and assignments, SI and the other Stoller companies began to use the mark on those goods as well, with SI retaining ownership rights.[5] Stoller Decl. ¶¶ 4 –10. Stoller states that under a ten-year marketing and licensing plan he established in 1985, his companies have "spen[t] a great [sic] money promoting [and] building the mark STEALTH into a national brand, recognized by buyers throughout the United States and the entire World." Stoller Decl. ¶¶ 11–13.

SI currently holds title to seven federal registrations for the STEALTH mark, two of .which are relevant here. Registration No. 1,332,378 covers "sporting goods, specifically,

**3.** SI voluntarily dismissed Count V, a claim under the Illinois Counterfeit Trademark Act, 765 ILCS 1040/1 et seq. On June 1, 1997, the Illinois General Assembly repealed the Act's provisions permitting private rights of action. See S Indus., Inc. v. Diamond Multimedia Sys., Inc., 991 F.Supp. 1012, 1022–23 (N.D.Ill.1998).

**4.** The facts are derived from the parties' Local Rule 12(M)-(N) statements of fact and accompanying evidentiary materials.

**5.** The defendants devote a fair amount of time to contesting which of Stoller's companies owns the STEALTH mark and which companies were and are properly licensed to use it. Because the defendants prevail on the merits, we assume for the purposes of this ·opinion that SI currently owns the mark, and that the other Stoller companies hold valid licenses to use it on the goods at issue in this case.

tennis rackets, golf clubs, tennis balls, basketballs, baseballs, soccer balls, golf balls, cross bows, tennis racket strings and shuttle cocks." The Patent and Trademark Office ("PTO") issued this registration on April 23, 1985, with January 15, 1981 listed as the date of the mark's "first use" in commerce. Registration No. 1,434,642, issued by the PTO on March 31, 1987, encompasses "bicycles, motorcycles, and boats" and lists January 1982 as the date of first use.[6] None of the STEALTH registrations mentions athletic shoes or boots, rubber, or rubber shoe soles. Stoller nevertheless claims that his companies have been using the STEALTH mark on athletic shoes since at least 1985. SI and Stoller do own registrations covering shoes under the trademarks SENTRA, LOVE YOUR BODY, WHITE LINE FEVER, and DARK STAR, but not STEALTH.

The Stoller companies market and sell STEALTH sporting goods products (and, allegedly, STEALTH athletic shoes) directly through catalogs and sales representatives, and wholesale through broad-based retailers such as Wal–Mart and K–Mart. In addition, the Stoller companies have entered into numerous license agreements permitting third parties to use the STEALTH mark on sporting goods. Four license agreements specifically allow third-party use of STEALTH on footwear. Stealth Industries executed the first of these with Puma USA.

In December 1988, one of Puma's attorneys, Bert Collison, contacted Stealth Industries to ask whether it had used the STEALTH mark on shoes. Stealth Industries' attorney, John Brezina, replied that the company had been using the mark on shoes

since at least 1985. Collison Dep. at 17. He supplied Collison with the following proof: a May 28, 1986 invoice for a black referee shoe, which does not indicate what mark, if any, is on the shoe; two undated photocopies of catalog pages with four pictures of shoes, none of which visibly bears the STEALTH mark but which are described respectively as STEALTH athletic shoes, STEALTH oxfords, white STEALTH tennis shoes and black STEALTH tennis shoes; an undated photocopy of what looks like a shoe with the word STEALTH on one side of the heel (attorney Brezina states that he made this photocopy from a STEALTH shoe that Stoller gave him); and a typed page from a June 3, 1988 Stealth Industries general ledger listing "shoes" as one of the items and displaying the handwritten words "ALL STEALTH BRAND" at the top. Collison Dep. Ex. 111—115. Collison does not remember whether he ever saw an actual STEALTH shoe, but "assumes" that he must have.

SI and Puma executed an agreement on February 1, 1989 that made Puma USA the exclusive licensee for the STEALTH mark on "footwear." Payment was on a royalty basis. Among other things, the agreement required Puma to pay a $10,000 fee upon signing, an annual advance minimum royalty of $4000, and 2% of its net sales of STEALTH footwear. In return, Stealth Industries promised to file an application with the PTO to register the STEALTH mark for footwear. It appears that in 1990 Puma promoted basketball shoes designated as "PUMA Stealth," but none of Puma's ads shows the STEALTH mark appearing on the shoe.[7]

---

6. SI's other federal registrations for the STEALTH mark cover microwave absorbing automobile paint (No. 1,717,010 registered in 1992); pool cues, pool tables, darts billiard balls, cue cases, cue racks, and billiard gloves (No. 1,867,087 registered in 1994); comic books (No. 2,007,348 registered in 1996); lawn sprinklers (No. 2,024,889 registered in 1996); and metal alloys for use in sporting goods and transportation and window locks (No. 2,025,156 registered in 1996). Stoller and his companies have several more pending applications to use STEALTH on an extensive range of goods.

7. It is less than clear whether Puma actually sold any of its "PUMA Stealth" basketball shoes. The

record contains numerous free-standing Puma ads for a "Stealth" basketball shoe—a shoe that does not visibly bear the STEALTH mark—as well as a Spring 1990 Puma footwear catalog showing pictures of basketball shoes with the word "Stealth" underneath the picture. But there is no evidence that the ads were ever published or that the catalog reached consumers. Bert Collison testified that he has "no idea" whether Puma ever sold any "Stealth" shoes. He also stated that no one at Puma knows what became of the 1989 license agreement. Collison Dep. at 52–53. Puma did, however, make advance royalty payments to Stealth Industries in 1989 and 1991, and SI submitted what looks like a Stealth Industries ledger from 1990 indicating

As promised, on February 27, 1989, John Brezina filed Stealth Industries' application to register the mark STEALTH for use on "Sport and Atheletic [sic] Shoes."[8] To demonstrate the mark's use on shoes, Brezina supplied the PTO with a photocopy that resembled the one he had provided to Puma. He listed January 1984 as the date that STEALTH was first used on shoes in commerce. On May 9, 1989, the PTO mailed Stealth Industries an Office Action that contained some preliminary determinations. First, the Examining Attorney noted that Stealth Industries' mark was "likely to be confused" with the mark STEATLHWEAR, which had already been registered by Covington Industries for use on camouflage clothing. The Examining Attorney also observed that Five Ten had an earlier pending application to use STEALTH on "shoe soles, [and] kits for resoling footwear comprised of rubber, cement and instructions," and that "[t]here may be a likelihood of confusion" with this mark as well. To this day, the PTO has made no determination on Stealth Industries' application—the PTO's Trademark Trial and Appeal Board ("TTAB") suspended it to await the outcome of this litigation.

Thereafter, Stoller and his companies entered three other STEALTH footwear license agreements: a 1994 non-exclusive license permitting Cabela's, Inc. to use the STEALTH mark on "footwear"; a 1995 non-exclusive license allowing The Sportsman's Guide to use the mark –40$ STEALTH on hunting boots; and a 1996 five-year license giving Mitsushiba International, Inc. the right to use STEALTH on golf shoes.

Stoller states that his companies continue to market and sell "a broad range of consumer products including athletic and sport shoes." Stoller Decl. ¶ 10. He attends trade shows that focus on athletic equipment and apparel for team and court sports participants.[9] And he continues to license the STEALTH mark for use on a wide variety of goods, aiding his efforts by appearing at the Licensing Industry Merchandiser's Association ("LIMA") show from 1995–1997, and the World Licensing Exposition in 1996. The mid-nineties have also marked Stoller's aggressive campaign to police his registered and common-law STEALTH trademarks in sporting goods and other products. He has been involved in at least 100 PTO actions and has filed over forty district court cases. Stoller Dep. at 465, 697.

## B. Five Ten, REI and Erehwon

Five Ten was founded in 1985 and incorporated in 1987 by its current CEO, Charles Cole. The California-based company manufactures and markets footwear, specializing in high-end rock climbing shoes. These shoes have soles made of a sticky, high-friction black rubber bearing the trademark STEALTH or STEALTH C4. The STEALTH mark appears only on the shoe soles or hangtags, never on the shoe uppers.

Cole, an avid rock climber who possesses both a mechanical engineering degree and an MBA from the University of Michigan, invented the sticky rubber, hoping to improve climbers' ability to navigate precipitous terrain. The name "Stealth" stems from Cole's days as a factory worker manufacturing parts for the B–1 Stealth Bomber, connoting his intentions to keep the rubber compound's formula top secret. Cole uses "master batches" of the compound to manufacture sheets of black STEALTH rubber, then markets the rubber on his Five Ten shoe soles and in sole replacement kits. The STEALTH rubber products appear exclusively in stores that specialize in outdoor and adventure sports equipment. Defendants Erehwon and REI, both outdoor retailers, sell various models of Five Ten shoes with STEALTH soles.

Cole states that he began selling STEALTH rubber for use on shoe soles in August 1987. He provides two invoices dat-

it received royalty payments for style numbers that correspond to the "Stealth" basketball shoes in Puma's 1990 catalog.

8. Application No. 73–783,038.

9. As examples, Stoller mentioned attending the Annual Charter Catalogue Merchandise Trade Exhibit, the Super Show in Atlanta, and shows sponsored by the National Sporting Goods Trade Association and the Sporting Goods Manufacturing Association. See Stoller Dep. at 514–19.

ed August 4 and 5, 1987 for the sale of "5.10 resole rubber ... 'Stealth'" to Mekan Custom Boots in Kearns, Utah and to Dave Page Cobbler in Seattle Washington. The record also contains two sales slips dated August 4 and 11, 1987 for "5.10 Resole Rubber 'Stealth'" made out to Brad Singer of California and Steven Handler of Maryland, respectively.

Cole started advertising STEALTH rubber in the February 1988 issue of *Climbing* magazine. The ad begins, "Introducing 5.10 STEALTH Rubber. After one year of rigorous testing Five Ten is proud to introduce the most advanced climbing boot rubber ever developed," and lists the names, addresses and phone numbers of several "official 5.10 resolers," including Mekan Custom Footwear and Dave Page Cobbler. An interview with Cole in the March/April 1998 issue of *Rock & Ice* followed, during which he discussed the characteristics and advantages of STEALTH rubber. In the same issue, Wheeler and Wilson Sports advertised that they were providers of "5.10's new STEALTH rubber." In June 1988, *Climbing* magazine published a product review, remarking that "this year's model" of a popular climbing shoe "uses 5.10's latest top-secret Stealth rubber." The first time pictures of shoes appear in an ad for STEALTH rubber is the August 1988 issue of *Climbing.* The full-page ad is titled "The Guts of our Boots," and depicts three climbing shoes above the words "STEALTH RUBBER." Below this is advertising text plugging the rubber and encouraging the reader to "ask [a top climber] what kind of rubber is *really* on the bottoms of his boots. Chances are that it will be 5.10 Stealth." The ad lists Five Ten's name, address and phone number at the bottom.

On November 1, 1988, Five Ten filed an application with the PTO to register STEALTH for use on "boots, shoes and sandals; sheet rubber for soling or resoling footwear; kits of rubber, cement and instructions for resoling footwear,"[10] listing August 4, 1987 as the date STEALTH was first used on these goods. The Examining Attorney later amended Five Ten's application to cover "shoe soles; kits for resoling footwear comprised of rubber, cement and instructions." The PTO published Five Ten's mark for opposition in *The Official Gazette*[11] on July 18, 1989, prompting Stealth Industries to formally oppose (Opposition 81,164) the application on September 18, 1989. The TTAB suspended proceedings on Opposition 81,164 on July 25, 1997, pending final resolution of this case.

Although its initial application remains unresolved, Five Ten was nonetheless successful in registering the STEALTH mark under a slightly different description of goods. On January 13, 1992, it applied to register the mark STEALTH for use on "sheet rubber having high friction and damping characteristics, and for use in the manufacture of gripping and antiskid surfaces, and for vibration isolation."[12] The date of first use in commerce is listed as August 4, 1987. The PTO issued Registration No. 1,782,681 for these goods on July 20, 1993. Not to be outdone, Stealth Industries filed a petition to cancel (Cancellation No. 24,688) the registration on January 16, 1996. Again, the TTAB suspended proceedings on Cancellation 24,688 in deference to this litigation, leaving Five Ten's registration intact.

Five Ten has continued to advertise in publications directed at outdoor adventure enthusiasts, to showcase its products at trade shows (such as Outdoor Retailer) that feature outdoor adventure goods, and to sell its shoes through outdoor adventure specialty stores. The record contains evidence that STEALTH soles are extremely popular among climbers because of the rubber's high-friction, rock-gripping characteristics. STEALTH rubber soles now appear on an expanded Five Ten product line, which includes approach shoes (closer to a hiking boot), river shoes, and all terrain shoes. In addition, Five Ten worked with LL Bean to create a new formulation of STEALTH rub-

---

**10.** Application No. 73–761,259.

**11.** *The Official Gazette* (trademark section) is the PTO's weekly publication that lists trademarks being published for opposition. The publication shows the mark, the goods covered, and the date of first use in commerce.

**12.** Application No. 74–237,222.

ber—"Aqua Stealth"—for underwater traction boots used in sports such as fly-fishing. LL Bean began selling a boot with the Aqua Stealth sole in its 1996 fly fishing catalogue.

## C. This Lawsuit

Apparently not satisfied with the pace of the administrative battle before the PTO, SI filed suit in this Court on July 12, 1996. It claims that the defendants' manufacture and sale of Five Ten's STEALTH-soled climbing shoes and water terrain footwear (including LL Bean's boot with Aqua Stealth soles) infringe its two federally registered trademarks for sporting goods and "bicycles, motorcycles, and boats" (Count I); infringe its federal common-law rights in the STEALTH mark on athletic shoes and boots (Counts II and III); and violate various state-law consumer protection statutes (Count IV). As relief, SI seeks both a permanent injunction and monetary damages.

The parties have filed cross-motions for summary judgment on all claims. Because we find that defendants have not infringed any of SI's STEALTH trademarks as a matter of law, we grant the defendants' motion and deny SI's motion.

## LEGAL STANDARDS

### I. Summary Judgment

Summary judgment is proper when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir.1994). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, and draw all reasonable inferences from the evidence in the nonmovant's favor. *Cincinnati Ins.*, 40 F.3d at 150. But if the evidence is merely colorable, or is not significantly probative, or just raises "some metaphysical doubt as to the material fact," summary judgment may be granted.

*Liberty Lobby*, 477 U.S. at 261, 106 S.Ct. 2505; *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505.

When the parties submit cross-motions for summary judgment, the court is not required to grant judgment as a matter of law for one side or the other. *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993). The court must evaluate each party's motion on its own merits, resolving factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration. *Id.; Buttitta v. City of Chicago*, 803 F.Supp. 213, 217 (N.D.Ill.1992), aff'd, 9 F.3d 1198 (7th Cir.1993).

## II. Lanham Act Claims—Federal Trademark Infringement

█ SI's federal trademark infringement claims (Counts I, II and III) are governed by two different sections of the Lanham Act: 15 U.S.C. § 1114(a) (prohibiting infringement of registered marks) and § 1125(a) (providing relief for unfair competition, including false designation of origin). To prove infringement of its registered marks under § 1114(a), SI must show that (1) its marks are registered; (2) the defendants used the marks in commerce without SI's consent; and (3) that the defendants' unauthorized use is likely to confuse consumers or deceive the public. *S Indus., Inc. v. Diamond Multimedia Sys., Inc.*, 991 F.Supp. 1012, 1017 (N.D.Ill.1998); *S Indus., Inc. v. GMI Holdings, Inc.*, 1998 WL 67627, at *3 (N.D.Ill. Jan.30, 1998); *Dunkin' Donuts, Inc. v. Towns Family, Inc.*, 1996 WL 328018, at *2 (N.D.Ill.1996). SI holds two federal registrations for STEALTH, which cover sporting goods and "bicycles, motorcycles, and boats." It is undisputed that Five Ten, REI, and Erehwon use the STEALTH mark in com-

merce. As such, likelihood of confusion is the only remaining section 1114 issue.

■ Section 1125(a) "prohibits a broader range of practices" than § 1114(a), *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (internal quotations and citations omitted), extending its reach to protect both registered and unregistered marks from unfair competition that is likely to confuse or deceive consumers. *See Diamond*, 991 F.Supp. at 1017. SI brings two claims under this section: one for unfair competition and one for false designation of origin (which is really just a species of unfair competition). Both require SI to prove (1) prior, protectable rights in (a.k.a. "senior use" of) a mark; and (2) that the defendants' junior use of the mark is likely to confuse consumers or deceive the public. *Diamond*, 991 F.Supp. at 1017–18 (citing *Dunn v. Gull*, 990 F.2d 348, 351 (7th Cir. 1993)); *see Forum Corp. v. The Forum, Ltd.*, 903 F.2d 434, 439 (7th Cir.1990); *see also G. Heileman Brewing Co. v. Anheuser–Busch, Inc.*, 873 F.2d 985, 999 (7th Cir.1989) ("[T]he first user of a mark may maintain an action for unfair competition under the Lanham Act by showing a likelihood of confusion as to the source of the goods in question.").

■ It is undisputed that SI owns prior protectable rights in the STEALTH mark for the goods identified in its federal regis-trations.[13] The parties disagree, however, over who has prior rights in STEALTH for various shoes and shoe-related products, which are not listed in SI's registrations. The parties also disagree on the likelihood of confusion resulting from the defendants' uses of the STEALTH mark.

Left for this Court's determination on the Lanham Act claims, then, are two issues: (1) did SI use the STEALTH mark on athletic shoes and boots before Five Ten started using the mark on high-friction rubber and climbing shoe soles; and (2) are the defendants' uses of the STEALTH mark likely to cause confusion in light of (a) SI's registered marks or (b) the Stoller companies and their licensees' use[14] of STEALTH on athletic shoes and boots.[15] We acknowledge that a negative answer to the first question would relieve us from having to consider issue (2)(b). Nevertheless, we address all the issues to underscore the lack of merit to SI's claims.

## ANALYSIS

### I. Five Ten Used STEALTH on Rubber Soles Before SI Used it on Athletic Footwear

#### A. Trademark Rights Derive From Use

■ "Trademark rights are acquired by adoption and use, not by registration." *Dia-*

13. Adopting and using a trademark—not registering it—is what establishes trademark rights. *See Diamond*, 991 F.Supp. at 1017. "Registration itself only establishes a rebuttable presumption of use as of the filing date." *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir.1992). Since defendants do not attempt to rebut this presumption by offering evidence that SI does not use the STEALTH mark on its registered goods, we afford SI the benefit of this presumption and assume that it does.

14. Licensees' proper use of a trademark inures to the benefit of the mark's owner. *See* Restatement (Third) of Unfair Competition § 33 (1995) ("If the licensor exercises reasonable control over the nature and quality of the goods, services, or business on which the designation is used by the licensee, any rights in the designation arising from the licensee's use accrue to the benefit of the licensor."). Comment b elaborates:

The [trademark] owner may thus rely on use by controlled licensees to prove. . . . the fact of

continuing use of the mark. . . . If the license authorizes use on goods or services other than those previously marketed by the trademark owner, the licensee's use can also extend the trademark owner's rights into additional product markets.

Moreover, a trademark owner can establish senior use through a controlled licensee. Restatement (Third) of Unfair Competition § 33 notes to comment b ("Section 5 of the Lanham Act as amended in 1988, 15 U.S.C.A. § 1055, explicitly recognizes the acquisition of trademark rights by a licensor through a first use of the mark by a controlled licensee."); *see* 15 U.S.C. § 1055 (1997) ("If first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure the benefit of the registrant or applicant, as the case may be.").

15. Defendants also urge us to find that SI's suit is barred under the doctrine of laches; because we rule for defendants on the merits we need not address this issue.

*mond*, 991 F.Supp. at 1018. Although registration establishes a rebuttable presumption that the mark was first used on the filing date, *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 504 (7th Cir.1992), SI has only applied to register STEALTH for use on athletic shoes and boots. Simply filing an application is not sufficient to create rights in the mark. *See Diamond*, 991 F.Supp. at 1019 (citing *Hydro–Dynamics, Inc. v. George Putnam & Co.*, 811 F.2d 1470, 1472 (Fed.Cir.1987)). Consequently, SI must establish its rights to STEALTH on athletic footwear under the common law, which confers ownership on the person who employs the "first actual use of a mark in a genuine commercial transaction." *Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*, 146 F.3d 350 (6th Cir.1998). In short, "one must win the race to the marketplace." *Zazu*, 979 F.2d at 503.

■■■ "Use" under the common law means that the mark was attached to a product sold to the public. *Id.* 979 F.2d at 503; *Blue Bell*, 508 F.2d at 1265. The use must be continuous and bona fide to impart ownership—de minimus sales, a few shipments, or pre-marketing tactics that attempt to "reserve" the mark will not do. *See Zazu*, 979 F.2d at 503, 505 ("Only active use allows consumers to associate a mark with particular goods and notifies other firms that the mark is so associated;" "reserving a mark is forbidden"; dispensing a few sample products is a "pre-marketing maneuver" that is insufficient to confer trademark rights); *Allard*, 146 F.3d 350, 358 (single use in trade must be "followed by continuous commercial utilization" to establish trademark rights) (quoting *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir.1975)); *Diamond*, 991 F.Supp. at 1018 ("It is axiomatic that the right to a distinctive mark belongs to the person who first continuously uses the mark to identify or distinguish goods or ser-

vices in commerce."). Likewise, the mere intent to use a mark is insufficient. *Zazu*, 979 F.2d at 504; *Allard*, 146 F.3d at 356. In any given case, the amount of activity that constitutes "use" depends on the facts. *Lucent Information Management, Inc. v. Lucent Technologies, Inc.*, 986 F.Supp. 253, 258 (D.Del.1997). The guiding principle is that the activity be "sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Blue Bell*, 508 F.2d at 1266.

■■■ SI contends that the Stoller companies made continuous, bona fide commercial use of STEALTH on athletic shoes and boots since 1985, establishing priority over the defendants' allegedly later use of STEALTH on rubber and climbing shoe soles.[16] Defendants rejoin that SI has no evidence that the Stoller companies ever sold a STEALTH shoe to the public or engaged in any activity that constitutes adoption and use. Even assuming Puma used the mark on shoes as a licensee, defendants argue, Five Ten used STEALTH on its products well before the licensing agreement was even executed. Defendants also argue—quite forcefully—that SI and Stoller fabricated evidence in attempt to show first use.

We agree with defendants' first two points, which are dispositive. The fabrication argument we find persuasive, but not conclusive; Stoller offers an explanation that is tenable enough to prevent us from finding as a matter of law that he perpetrated a fraud on this Court.

### B. SI Cannot Show Senior Use

■■■ SI attempts to show senior use with the following evidence:

- Leo Stoller's unsupported assertions that his companies began using STEALTH

---

16. A senior user enjoys superior rights in the mark not only on goods that compete directly with its own, but also on goods that are "closely related" to the senior user's products. *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 958 (7th Cir.1992). Implicit in SI's claim of senior use is that athletic shoes and boots are closely related to rubber and rubber soles on climbing shoes. A "closely related" product is one that "would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Id.* (internal quotations and citations omitted). This is the same inquiry involved in assessing the likelihood of confusion, *see* 15 U.S.C. § 1125(a), an issue we take up later in the opinion. Even assuming (for now only) that these goods are closely related, it is irrelevant because we find that Five Ten used STEALTH on its products first.

on athletic shoes and boots in 1984 or 1985

- 1986 invoices for the sale of tennis shoes, leather shoes, oxford shoes, "ref" shoes, and athletic shoes—none of which indicate what mark, if any, these shoes bore

- 1985 and 1986 internal strategy memoranda that discuss expanding STEALTH to other products, but do not mention shoes

- a "STEALTH Catalog '88" displaying two shoes that do not bear the STEALTH mark on either the shoe or its sole, but are described as "STEALTH Tennis Shoe[s]" in misaligned font that is vastly different than the print on the rest of the page—a page on which all the other items bear only the SENTRA mark

- 1984 and later inter-Stoller-company license agreements that license STEALTH on products in "the approved catalog"

- two affidavits from former Stoller company customers—both of whom surfaced in other SI trademark infringement lawsuits—stating in a conclusory manner that they purchased "STEALTH brand" shoes in 1985 and 1988

- the "proof" of use that Stealth Industries provided to Puma in December 1988 (a May 1986 invoice for the sale of a "blk. ref. shoe"; two undated photocopies of catalog pages exhibiting shoes that do not visibly bear the STEALTH mark; an undated photocopy of a shoe with the word STEALTH on one side of the heel; and a typed 1988 general ledger listing "shoes" and displaying the handwritten words "ALL STEALTH BRAND" at the top); Puma attorney Bert Collison's testimony that he "assumes" he "must have" seen a STEALTH shoe in December 1988; and an affidavit from Stealth Industries' former attorney John Brezina stating that he made the photocopy from a STEALTH shoe Stoller gave him

- the February 1, 1989 Puma license agreement and advance royalty payments in 1989 and 1991

- undated, free-standing ads for a "PUMA Stealth" shoe that does not visibly bear the STEALTH mark; a Spring 1990 Puma footwear catalog showing pictures of basketball shoes with the word "Stealth" below the pictures; a 1990 Stealth Industries ledger indicating the company received royalty payments for style numbers that correspond to the "Stealth" basketball shoes in Puma's 1990 catalog

- a May 17, 1990 cease and desist letter from Stealth Industries' attorney to Five Ten asserting that Stealth Industries has sold athletic shoes under the STEALTH mark "for many years"

- three agreements between the Stoller companies and third parties licensing STEALTH for use on "footwear" (1994), boots (1995), and golf shoes (1996)

None of these items would permit a reasonable jury to find that the Stoller companies or their licensees made continuous, bona fide commercial use of the STEALTH mark on athletic shoes or boots prior to Five Ten's use. As such, SI's claim to common-law rights in the STEALTH mark fails as a matter of law.[17]

We begin with the "STEALTH Catalog '88," one of several catalogs in the record. Also appearing are a "1987 Chestnut Catalog" and several copies of a "Chestnut Catalog '88." On page 7 of the STEALTH Catalog '88, titled "STEALTH high quality bags," seven items appear—four tennis bags, one tennis racquet cover (items A., B., C., F., G.), and two tennis shoes (items D. and E.). These are the only shoes in the catalog. To the naked eye, no mark is visible on either the shoe uppers or soles, which are both prominently displayed. Nevertheless, the item descriptions proclaim that these are "STEALTH tennis shoe[s]," available in white or black, boasting a "Genuine leather upper, with gummy sole for extra traction on the court." The word "STEALTH" in the

---

**17.** This defeats SI's § 1125(a) claim insofar as it is premised on infringement of SI's unregistered marks.

descriptions is a different size and in a different font than the print on the rest of the page. Three of the bags on the page contain the mark SENTRA; no mark is visible on the fourth bag or the racquet cover.[18]

Page 7 of the "Chestnut Catalog '88" is exactly the same, with one exception—the shoes are described as "SENTRA tennis shoe[s]." But they have model numbers identical to the shoes in the STEALTH catalog. In contrast to the STEALTH catalog, the word "SENTRA" is the same size and font as the words "tennis shoe" that follow it. The "1987 Chestnut Catalog," although different from the other two catalogs, contains pictures of two shoes as well—the SENTRA athletic shoe and SENTRA Oxfords.

Defendants employed a Board Certified Forensic Document Examiner, Diane Marsh, who conducted visual, microscopic, and close-up photographic examinations of the "STEALTH Catalog '88" and the 1987 and 1988 Chestnut Catalogs to determine what marks appear on the merchandise and whether the catalogs have been altered.[19] Her most important finding for our purposes concerns the shoe in item E. on page 7 of the STEALTH Catalog '88: her examination revealed the letters "SEN" and a portion of a "T" and an "A" on the shoe upper. She found no indication that the STEALTH mark appears on the shoes in items D. or E.

Marsh's other primary conclusion is that the STEALTH Catalog '88 was created using the Chestnut Catalog '88 as a base. She opined that someone had pasted cut-outs of the word STEALTH over the printed word SENTRA on several pages in the Chestnut catalog and then photocopied the pages to make the STEALTH catalog. Her examination revealed "trash lines" and stray marks—which she testified are hallmarks of cut-and-pasted material—surrounding the word STEALTH on many pages in the catalog; that the font on STEALTH in many places does not match the printing in the rest of the catalog; that the word STEALTH is often misaligned, cut off, or runs into other words; and that the catalog's print lacks sharpness and exhibits toner instead of printer ink. This led her to conclude that the STEALTH Catalog '88 is an altered document. She could not date it, however.[20]

Stoller admits that the STEALTH Catalog '88 was a paste-up job created from one of his company's other catalogs, but insists that the catalog was produced in 1987 and distributed "nation-wide to mass merchants, catalog showrooms and other smaller companies in 1988 and 1989." Stoller Decl. ¶ 21. He testified that he (personally, along with "inexperienced key line people") made many of his catalogs this way because his companies lacked the resources for professional

18. Interestingly, SI attached to its complaint a STEALTH Catalog whose cover page is different from the STEALTH Catalog '88 produced during discovery. The first page of the Catalog attached to the complaint does not have a date—it simply says "STEALTH Catalog"—does not have a toll free number at the bottom, and omits the words "Sentra Guarantee" in the bottom right corner.

19. SI attacks Marsh's qualifications by seizing on her testimony that her primary area of expertise is handwriting analysis. This does not negate the numerous qualifications in Marsh's CV, which include three board certifications in document examination, extensive training in the area, and several publications on the topic of document examination. See Marsh Aff. Ex. A.

20. Among the many other bizarre inconsistencies in the catalogs, Marsh observed: (1) The Chestnut catalogs contain only SENTRA-marked, but not STEALTH-marked goods, while the STEALTH catalog contains both SENTRA and STEALTH goods. When STEALTH appears, the word often bears obvious evidence of transposition (misalignment, running into other words, being cut off the page); (2) An item in the STEALTH catalog described as "STEALTH Genuine Leather" corresponds to a picture of a soccer ball with the word SENTRA on it. The Chestnut Catalog '88 describes the same item as "SENTRA Genuine Leather"; (3) Page 13 of the STEALTH catalog contains items lettered A. through J. In the description for item B., the "STEALTH Timer," the letter "B." is blocked out by the word STEALTH. All the other item descriptions are preceded by letters, and none of the products are described as STEALTH. In comparison, the same item in the Chestnut Catalog '88 displays the letter "B." and denotes the product as the "SENTRA Timer"; and (4) Page 14 of the STEALTH catalog pictures an item with the word "videosender" on it. The description, however, says "The Video STEALTH," and STEALTH appears in a different font and case than the word "Video." The same item in the Chestnut Catalog '88 is described as "The Video Sender" in consistent typeface and case.

printing. Asked what catalogue he used as a base, Stoller answered:

> I don't remember. I think—we would take one catalogue. We would make another catalogue from that catalogue. We would make a third catalogue from that catalogue, and we would use some of the— some of the, you know, copy interchangeably depending on which particular market we were sending it out to. So, I mean, this is 1997. We're talking about something that took place in 1987, 10 years ago. So all I can tell you is that this was produced on our own computers and in-house with our own key line paste-up.

Stoller Dep. at 531–32. This convoluted explanation, along with Marsh's inability to date the STEALTH Catalog '88, just barely saves Stoller from a finding that he submitted fabricated evidence in a federal court proceeding. But none of this questionable evidence establishes first use.

The STEALTH Catalog '88 does not show that the Stoller companies ever sold athletic shoes to the public with the STEALTH mark, much less that the shoes were the subject of continuous, bona fide commercial use. First, the STEALTH mark appears nowhere on the shoes in the catalog. In fact, Diane Marsh's expert examination revealed that the shoes in item E. actually bear the SENTRA mark. Simply describing the shoes as "STEALTH tennis shoes" in the catalog does not confer ownership rights in the mark. *See Avakoff v. Southern Pacific Co.*, 765 F.2d 1097, 1098 (Fed.Cir.1985) ("Mere advertising of a product and documentary use of a symbol apart from the goods does not constitute trademark use."). Nor does it demonstrate that any STEALTH shoes entered the stream of commerce. *See Zazu*, 979 F.2d at 503 (" 'use' means sales to the public of a product with the mark attached").

▇▇▇▇ Second, this single catalog from the year 1988 shows, at most, a single use of STEALTH on shoes. There is no evidence that this was followed by "active use" that "allows consumers to associate a mark with particular goods and notifies other firms that the mark is so associated." *Zazu*, 979 F.2d at 503. "For advertising alone to constitute use it must be 'of sufficient clarity and repetition to create the required identification [and] must have reached a substantial portion of the public that might be expected to purchase the [goods].' " *Lucent*, 986 F.Supp. at 259 (quoting *T.A.B. Sys. v. Pactel Teletrac*, 77 F.3d 1372, 1376 (Fed.Cir.1996)); *see also Windows User, Inc. v. Reed Business Publishing, Ltd.*, 795 F.Supp. 103, 109 (S.D.N.Y. 1992) ("Although advertisements and promotional activities may be relied on to demonstrate priority in use of a mark, this is the case only where it can be shown that such an activity was of a nature and extent such as to create an association of the term with the user's goods.") (internal quotations and citations omitted). SI presents no such evidence of repetition or public association of the STEALTH mark with these goods.

SI's evidence of pre–1988 use is even more spurious. The 1986 invoices are insufficient evidence of use because they contain no indication that the shoes sold bore the STEALTH mark. The shoes are described only by their model numbers and type, i.e., athletic shoe, oxford shoe, tennis shoe, leather shoe or "ref." shoe. The model numbers are not helpful because the STEALTH '88 and Chestnut '88 catalogs use identical numbers for both the SENTRA and STEALTH shoes. That these are "Stealth Industries" invoices is equally unavailing because the STEALTH Catalog '88, which was published by Stealth Industries, does not exhibit shoes bearing the STEALTH mark. Moreover, the record contains Stealth Industries invoices that attach orders for the SENTRA athletic shoe. Even if these invoices did feature the words "STEALTH shoes," this would not constitute evidence of use. *See Diamond*, 991 F.Supp. at 1019 ("Invoices alone cannot demonstrate trademark use."); *The Boss Co. v. Homemaker Rugs, Inc.*, 117 U.S.P.Q. 255, 255 (N.D.Ill.1958) (holding that the designation "Wooltone" on an invoice for the sale of rugs did not create rights in the WOOLTONE mark because it "did not show use as a trademark on the rugs").

Stoller's testimony is no better. His declaration contains several conclusory statements that his companies "advertised, marketed, and sold" athletic shoes "[f]rom at least as

early as 1985 to the present date." Absolutely nothing in the record supports this. Stoller's internal strategy memoranda from 1985 and 1986 talk about expanding use of the STEALTH mark to all manner of goods—but not shoes. Inter-company license agreements for the STEALTH mark executed in 1984 and 1985 permit use on goods in the "approved catalog." But no catalog is attached to the agreements, and SI has not produced any catalogs from these years, much less catalogs advertising STEALTH shoes. Not one document even mentions a STEALTH shoe until 1988—and we have already established that the STEALTH Catalog '88 fails to show use. It is apparent that Stoller's declaration is merely a self-serving document without factual support in the record; as such, it cannot create a fact issue to withstand summary judgment. *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295 (7th Cir.1993).

Stoller's deposition testimony likewise fails to create an issue of fact as to prior use because it is internally inconsistent, flatly contradicted by documentary and physical evidence, and uncorroborated. Stoller insisted in his deposition that his companies have been selling shoes with the STEALTH mark since 1984. He could not locate any documents to support this, however, and did not produce any catalogs from the years 1984–1986.[21] Although the 1987 Chestnut catalog pictures only SENTRA shoes, Stoller claimed that "all the products in this Chestnut catalogue were sold under the name Stealth and also under the name Sentra." Stoller Dep. at 118. Later he testified that the shoes in this catalog "would have had both marks" on them. *Id.* at 678.

Confronted with the fact that the SENTRA and STEALTH shoes shared the same model number in the STEALTH '88 and Chestnut catalogs, Stoller replied simply that "[t]he 800 was the shoe and the 800 was sold under the Stealth mark and the 800 was sold under the Sentra mark." *Id.* at 536. Using the white tennis shoe as an example, Stoller explained that it "could have been sold under the Stealth mark or it could have been sold under the Sentra mark." *Id.* at 536–37. Asked how he determined which mark the customer wanted on a shoe, Stoller said, "if they ordered a Stealth shoe, they would get the Stealth shoe. If they ordered the 800 and they said they wanted the Sentra shoe, they would get the Sentra shoe." *Id.* at 544. At various points, however, Stoller insisted that both the STEALTH and SENTRA marks appeared on his shoes. *See id.* at 546 ("Both the Stealth and Sentra trademarks were sold on my shoes."); *id.* at 614 ("I'm going to testify that the shoes left the warehouse with both marks on them."); *id.* at 546 ("I could have the name Sentra on one side and the name on the other side was Stealth."). In particular, he claimed that the white tennis shoe, model number 037–800W, "would have left our warehouse with the trademarks Stealth and Sentra on it." *Id.* at 616. Then Stoller backtracked and said that both marks appeared at least on the packaging. *Id.* at 543, 544, 665. Stoller was unable to provide any shoe specimens or corroborative documents, and stated he could not remember the last names of any employees who worked for his companies during this period.[22] *Id.* at 576–578, 671–672.

This testimony is inconsistent, confusing, and directly contradicted by the STEALTH and Chestnut catalogs. The shoes in the Chestnut catalogs bear only the SENTRA mark and are described as SENTRA shoes. None display the STEALTH mark, either alone or in conjunction with SENTRA. The shoes in the STEALTH catalog are either unmarked or labeled with SENTRA. Again, they neither exhibit the STEALTH mark nor show both marks. As for Stoller's comment that his shoes were packaged with the

---

21. Defendants obtained a SENTRA Sports Equipment Catalog for 1985 from one of the Stoller companies' former customers. No shoes of any kind appear in the catalog's pages.

22. Stoller's excuse is that his father and brother ousted him from the business between 1990–1994, during which time he had no access to the documents that allegedly support his testimony.

He testified that by the time he regained control, his brother and father had disposed of the documents. Stoller Dep. at 576–78. Although the record supports his removal from control, it is no excuse for the lack of proof. Stoller brought the lawsuit; he has the burden of locating and turning over adequate proof to sustain it.

STEALTH mark, the record contains no evidence of any packaging—marked or unmarked—used to ship the shoes.

In addition, the defendants present photographs of a white SENTRA tennis shoe with no STEALTH mark on it, compliments of Richard Rutter, who bought the shoe from Stealth Industries in 1986.[23] Rutter testifies that he purchased many items, including shoes, from the Stoller companies during the years 1986 through 1988. He provides a Stealth Industries invoice documenting that he bought a white SENTRA tennis shoe, model number 037–800W, in November 1986. This is the model number that Stoller claimed left his warehouse with both marks; but Rutter's pictures (taken from several angles) show only the SENTRA mark—it appears on the shoe tongue, on each side of the shoe near the laces, and on the shoe heel.

In light of this evidence, we cannot parse anything together from Stoller's testimony that does more than suggest "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), as opposed to creating a genuine issue for a jury. Stoller's deposition testimony is thus no more probative than his conclusory, self-serving declaration, and cannot defeat summary judgment. *See United States v. Kitsos*, 770 F.Supp. 1230, 1237 (N.D.Ill.1991) (Shadur, J.) (" 'The removal of a factual question from the jury is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff has deliberately committed perjury.' ") (quoting *Johnson v. Washington Metropolitan Area Transit Authority*, 883 F.2d 125, 128 (D.C.Cir.1989)), *aff'd*, 968

F.2d 1219, 1992 WL 164290 (7th Cir.1992); *see also Stewart v. RCA Corp.*, 790 F.2d 624, 628 (7th Cir.1986) ("A court might be able to find a witness incredible as a matter of law if he had told a different story under oath before recognizing the legal significance of the truth, or if the current story were irrefutably contradicted by documentary evidence.").

Finally, SI attempts to support its claim of senior use with the affidavits of two former customers. David Todoroff states that he is a professional tennis instructor who has purchased a number of sporting goods products from the Stoller companies. In particular, he claims to have bought "both STEALTH brand tennis shoes and SENTRA brand tennis shoes" from Stealth Industries and SI in late 1985 and early 1986. The 1988 purchase of "STEALTH brand" shoes was from a catalog that "was known to me as STEALTH's 1988 catalog." Todoroff provides no invoices or other proof of sale and says he cannot locate any of these shoes or the catalogs from which he ordered them. He simply attaches a photocopied "STEALTH Catalog '88" that was "supplied by S Industries, Inc.'s counsel," and recalls using "just such a catalog" to buy the "STEALTH brand tennis shoes." Nicholas Bianchi, another customer from the 1980's, states that he also bought "STEALTH brand tennis shoes" from Stealth Industries in 1985 and 1988. Like Todoroff, Bianchi attaches a lawyer-provided STEALTH Catalog '88 and remembers using "just such a catalog" to make the 1988 purchase. But, like Todoroff, Bianchi cannot produce proof of purchase, shoe specimens, or actual catalogs. Stoller has offered both Todoroff and Bianchi as either witnesses or potential witnesses in other SI trademark infringement lawsuits.[24]

---

**23.** Rutter identifies himself as a former Chestnut Industries and Stealth Industries sales representative, a tennis pro who promoted their athletic products. SI denies that Rutter worked for either company, insisting that he was simply a customer who resold shoes to some co-workers at his factory job. Rutter's status as sales rep or customer is irrelevant, however. What matters is that he obtained the SENTRA shoe from Stealth Industries during the relevant time period.

**24.** Todoroff signed an affidavit in the *S Indus. v. Diamond Multimedia Sys., Inc.* case to support SI's senior use of STEALTH on computers. The court rejected his testimony as "containing conclusory statements which do not substantiate the affiant's claim of long-time familiarity with plaintiff's STEALTH computer products." 991 F.Supp. at 1020. After submitting the affidavit, Todoroff tried to avoid service of the defense attorneys' deposition subpoena. *See* Declaration of Ronald Lamb ¶¶ 4–7.

Aside from their highly questionable aspects, these affidavits are inadequate evidence of use as a matter of law. First, neither witness says that the STEALTH mark appeared on the shoes he bought. Both customers merely declare the purchase of "STEALTH brand" shoes from Stealth Industries in 1985 or 1986 and 1988. But the shoes in the STEALTH Catalog '88 do not bear the STEALTH mark, so any shoes Bianchi and Todoroff bought from that catalog cannot demonstrate use. And there is no evidence that the shoes Stealth Industries sold in 1985–86 were any different. Under these circumstances, proclaiming the purchase of "STEALTH brand" shoes does not translate into buying shoes that bore the STEALTH mark. *See Zazu*, 979 F.2d at 503 ("use mean[s] sales to the public with the mark attached").

Even if Todoroff and Bianchi had proof that the STEALTH mark was affixed to the shoes they bought, these constitute "de minimus" sales that do not bestow trademark rights. *See id.* at 505–06 (a few sales to customers were "insufficient as a matter of law" to establish use); *Diamond*, 991 F.Supp. at 1019 ("[T]hese invoices, which show only de minimus sales in the late 1980's, do not support S Industries' contention that it continuously used the STEALTH mark since 1985."); *see also Lucent*, 986 F.Supp. at 260 ("many other courts have refused to recognize trademark ownership by a party that can only point to limited sales ...."). This is in line with the axiom that trademark rights depend on active, continuous, bona fide commercial use. All we have here are a few sales of "STEALTH brand" shoes to two customers—who cannot produce any objective proof of the purchase or the product—in 1985 and 1988. At most, this shows infre-

quent, sporadic sales, not active, continuous use. The record is otherwise devoid of any evidence that the Stoller companies sold STEALTH shoes to the public.

The rest of SI's evidence, beginning with the undated "proof" provided to Puma in December 1988 and ending with the Stoller companies' footwear, boot and golf shoe license agreements executed in the mid-90's, becomes irrelevant in light of our determination that Five Ten began using STEALTH on rubber and climbing shoe soles in the summer of 1988. We note, however, that much of SI's later proof is just as inadequate to establish use as its earlier proof.[25] Turning to defendants' evidence, we find it defeats SI's senior use claim as a matter of law.

 Defendants present uncontested proof that Five Ten sold STEALTH-marked rubber for shoe soles to the public as early as August 1987, and that its advertising campaign was sufficient for outdoor adventure enthusiasts to associate STEALTH with high-end climbing shoe soles by mid–1988. We start with the four August invoices and sales slips for the sale of "5.10 Resole Rubber 'Stealth.'" Although invoices cannot demonstrate trademark use, "a party may establish that a shipment in commerce was a bona fide commercial transaction by evidence of subsequent events," *Hydro–Dynamics, Inc. v. George Putnam & Co.*, 811 F.2d 1470, 1474 (Fed.Cir.1987), as well as with proof that it "received the first order for trademarked goods." *Talk to Me Prods., Inc. v. Larami Corp.*, 804 F.Supp. 555, 561 (S.D.N.Y.1992), *aff'd*, 992 F.2d 469 (2d Cir. 1993).

The August 4 and 5, 1987 invoices indicate that Five Ten sold and shipped sheets of 5.10 resole rubber designated as STEALTH to

---

Bianchi's name surfaced in several SI cases as a consumer who was "confused" about whether SI was the source of various products, including bug zappers, garage door openers, and radios. *See* Affidavit of Joseph Krieger (attaching Stoller Deposition excerpts from *S Indus. v. Ecolab, Inc.* and *S Indus. v. JL Audio, Inc. et al.*; and the court's opinion in *S Indus. v. GMI Holdings, Inc.*). Bianchi gives similar "confusion" testimony in this case, which we take up later.

25. Take, for example, the December 1988 "evidence" that Stealth Industries gave Puma to

show that it was selling shoes under the STEALTH mark: the two catalog pages are undated and exhibit shoes that do not visibly display the STEALTH mark; the invoice contains no indication that the "blk ref shoe" bore the STEALTH mark; the Stealth Industries 1988 general ledger simply lists "shoes" without specifying the mark on them; and the photocopy of the shoe with STEALTH on the heel is undated and bears no evidence of the shoe's sale or shipment to the public.

Mekan Custom Boots in Kearns, Utah and to Dave Page Cobbler in Seattle, Washington. A few months later (in February 1988), *Climbing* magazine displayed an ad "Introducing 5.10 STEALTH rubber," the "most advanced climbing boot rubber ever developed," and listing both Mekan and Dave Page Cobbler as "official 5.10 resolers." This subsequent evidence makes clear that the August 4 and 5 shipments were bona fide commercial transactions involving trademarked goods. In addition, Five Ten provides evidence of an order for its trademarked goods. An August 5, 1987 letter from Steven Handler of Maryland requests "One Stelth [sic] (XX) sole"; it is followed in the record by an August 11, 1987 sales slip made out to Steven Handler for "5.10 sole rubber 'Stealth.'"

What followed these August 1987 sales was "active" and "continuous" commercial use. *See Blue Bell*, 508 F.2d at 1265 ("even a single use in trade may sustain trademark rights if followed by continuous commercial utilization."). Between February and August 1988, *Climbing* magazine and *Rock & Ice* published several advertisements for "5.10 STEALTH Rubber" or "STEALTH Rubber"; an interview with Charles Cole explaining STEALTH rubber's characteristics and advantages for climbers; and a product review discussing STEALTH rubber.[26] "For advertising alone to constitute use it must be 'of sufficient clarity and repetition to create the required identification [and] must have reached a substantial portion of the public that might be expected to purchase the service.'" *Lucent*, 986 F.Supp. at 259 (quoting *T.A.B. Sys. v. Pactel Teletrac*, 77 F.3d 1372, 1377 (Fed.Cir.1996)); *see also Windows User*, 795 F.Supp. at 109 (advertisements can show use if they are "of a nature and extent such as to create an association of the term with the user's goods.") (citations omitted).

Five Ten's advertising during 1988 easily meets this standard because (1) it was repetitive; (2) clearly identified STEALTH as a new, high-friction rubber used on Five Ten's climbing shoes soles; and (3) appeared in a number of specialty publications whose subscribers are interested in adventure sports such as rock climbing.

Unlike the advertisements in SI's catalogs, which are confusing because the shoes described as STEALTH show either the SENTRA mark or none at all, Five Ten's ads unambiguously identify its rubber soles under the STEALTH mark. Although the ads do not show a sole with the STEALTH mark on it, one would not expect such a display because the advertised value of STEALTH rubber is not its appearance, but rather its top-secret formula and gripping characteristics. Moreover, the record contains several photographs of Five Ten shoes with the mark STEALTH or STEALTH C4 on the soles.

In contrast, SI cannot produce even a single STEALTH shoe, much less any evidence that one was sold on the market. The earliest possible date SI used STEALTH on athletic shoes is 1990, when Puma appears to have began selling "PUMA Stealth" shoes under its license agreement with Stealth Industries. But Five Ten's August 1987 sales, along with its 1988 advertisements, establish that Five Ten began using STEALTH two years earlier—by August 1988 at the latest. This finding means that SI cannot show senior use, and that its § 1125(a) claim based on common-law trademark rights fails as a matter of law.

## II. The Defendants' Use of STEALTH Does Not Create a Likelihood of Confusion [27]

What remains for our determination is whether defendants' trademark use is

---

**26.** *See* Cole Aff. Ex. B (Feb.1988—"Introducing 5.10 STEALTH Rubber ... the most advanced climbing boot rubber ever developed"; "Stick to the rock with Five Ten and get stuck on STEALTH"); Ex. D (March/April 1988—lengthy, detailed interview in *Rock & Ice* explaining how Cole started producing STEALTH rubber, its subsequent testing, its characteristics and advantages); Ex. E (March/April 1988—"STEP UP TO THE FUTURE WITH STEALTH." Rock shoe resoles with 5.10's NEW STEALTH RUBBER);

Ex. E (product review of STEALTH rubber soles in June 1988 *Climbing*); and Ex. G (August 1988—pictures climbing shoes above the words "STEALTH RUBBER" and encourages the reader to "ask [a top climber] what kind of rubber is really on the bottoms of his boots. Chances are that it will be 5.10 Stealth.").

**27.** This is an alternative basis for rejecting SI's § 1125(a) common-law trademark infringement

likely to cause confusion in light of (a) SI's registered marks or (b) the Stoller companies and their licensees' use of STEALTH on athletic shoes and boots. The likelihood of confusion is a fact question that, "like any fact[,] can be determined at the summary judgment stage if not contestable." *Door Sys., Inc. v. Pro–Line Door Sys., Inc.*, 83 F.3d 169, 173 (7th Cir.1996). Judgment as a matter of law is proper on this issue "if the evidence is so one-sided that there can be no doubt about how the question should be answered." *Id.* 83 F.3d at 171.

Because a trademark is a source identifier, not a property right, "the use of a competitor's mark that does not cause confusion as to source is permissible." *Knaack Mfg. Co. v. Rally Accessories, Inc.*, 955 F.Supp. 991, 999 (N.D.Ill.1997) (citing *Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360, 1362 (7th Cir.1995)). To prevail in a trademark infringement suit, the plaintiff must demonstrate a likelihood, not the mere possibility, of confusion. *August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 619 (7th Cir.1995). The likelihood of confusion must be assessed "with reference to the realities of consumer behavior in the relevant market." *Dorr–Oliver, Inc. v. Fluid–Quip, Inc.*, 94 F.3d 376, 381 (7th Cir.1996). In this Circuit, the analysis proceeds according to a seven factor-test: (1) the marks' similarity in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by customers; (5) the strength of the plaintiff's mark; (6) actual confusion; and (7) the defendant's intent, if any, to "palm-off" its product as someone else's. *Rust Environment & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1216 (7th Cir.1997) (citations omitted). No single factor is dispositive, and the relative weight afforded each will vary among cases. *Dorr–Oliver*, 94 F.3d at 381.

SI argues that defendants' use of STEALTH is likely to cause source confu-

sion.[28] Before we analyze this, we clarify the relevant issues. The first is the likelihood of confusion in light of SI's registered marks, i.e., STEALTH on sporting goods, including tennis rackets, golf clubs, tennis balls, basketballs, baseballs, soccer balls, golf balls, cross bows, tennis racket strings and shuttle cocks; and bikes, motorcycles, and boats. *See Broderick & Bascom Rope Co. v. Goodyear Tire & Rubber Co.*, 531 F.2d 1068, 1070 (1976) (description of goods in registration controls for purposes of determining likelihood of confusion). The second is the likelihood of confusion in light of SI's alleged use of STEALTH on athletic shoes, and its licensees' use of STEALTH. *See* Restatement (Third) of Unfair Competition § 33 cmt. b ("If the license authorizes use on goods or services other than those previously marketed by the trademark owner, the licensee's use can also extend the trademark owner's rights into additional product markets."). We analyze these two issues simultaneously, beginning with the first factor, the similarity of the marks.

### A. Similarity of Marks

"A name is confusingly similar to an existing trademark if it is similar in sound, appearance, meaning, and connotation." *S Indus., Inc. v. GMI Holdings, Inc.*, 1998 WL 67627, at *6 (N.D.Ill. Jan.30, 1998) (citing *Knaack Mfg. Co. v. Rally Accessories, Inc.*, 955 F.Supp. 991, 1000 (N.D.Ill.1997)). Both parties use the mark STEALTH, fulfilling sound similarity. As for mark appearance, we have only photocopies of STEALTH shoes (provided to the PTO and Puma) to compare with Five Ten's photographs of its climbing shoes and their soles. SI offers no evidence of how STEALTH appears on the goods in its registrations or on its licensees' goods.

Viewed in isolation, the marks do look similar: both print STEALTH in upper-case letters using a similar font. But SI produced only a photocopy that cuts off the better

claims. It is the ruling disposing of SI's two registered trademark infringement claims brought under § 1114(a) and § 1125(a).

**28.** SI also asserts, in a conclusory fashion and without factual support, that defendants' use

causes sponsorship confusion and reverse confusion. Neither of these points merits any discussion apart from the likelihood of confusion analysis that follows.

portion of the shoe, making it difficult to difficult to perform a realistic evaluation. Without seeing an actual picture of the entire shoe, we cannot tell, for example, what other marks appear on it (according to Stoller, the shoe would also display SENTRA somewhere).

When observed from a consumer's marketplace vantage point, the similarities diminish. *See Knaack*, 955 F.Supp. at 999 ("The marks must be compared in light of what occurs in the marketplace, not sitting side by side . . . .") (citing *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir.1976)). SI's shoes display STEALTH on the shoe upper, while Five Ten's shoes contain the house mark "5.10" or "Five Ten" in various places on the shoe upper—STEALTH never appears there. STEALTH is found only on the sole, which is typically not visible in Five Ten's ads, and generally hidden in a shoe display and when the shoe is on someone's foot.

The marks also have different connotations because they refer to different things. *See Forum Corp. v. The Forum, Ltd.*, 903 F.2d 434, 441 (7th Cir.1990) (court must consider "the full range of ways that the parties communicate their marks to the public"). Five Ten's ads consistently portray STEALTH as the mark for the high-friction, strong-gripping rubber on its shoe soles, not its shoes.[29] SI, on the other hand, uses STEALTH haphazardly in a nonspecific manner. The word appears in random places in its catalogs, and the item descriptions do not elaborate on what STEALTH represents or refers to for a particular product.

Five Ten's use of a prominent house mark on the shoe upper and its relegation of STEALTH to the sole militates against confusion. *See G. Heileman Brewing Co. v. Anheuser–Busch, Inc.*, 873 F.2d 985, 999 (7th Cir.1989) (affirming district court's finding that defendant's "use of a prominent brand name" in conjunction with the trademark "dispelled any significant likelihood of confusion"). So does the specificity of Five Ten's ads, which make clear that STEALTH is the rubber, not the shoe. Thus, although SI's

shoe and Five Ten's soles have the word "Stealth" in common, context dispels the similarity.

**B. Similarity of the Products and Area and Manner of Concurrent Use**

Both of these factors weigh heavily in favor of the defendants. The test for similarity of products is " 'whether the products are the kind the public attributes to a single source.' " *Knaack*, 955 F.Supp. at 1000 (quoting *McGraw–Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1169 (7th Cir.1986)). Two important variables are competitiveness and relatedness. *See id.* Goods are related if consumers would use them in conjunction with each other. *GMI*, 1998 WL 67627 at *7; *Knaack*, 955 F.Supp. at 1000.

All of SI and its licensees' STEALTH-marked goods are noncompetitive with and unrelated to Five Ten's products. This is especially clear from examining the goods in SI's registrations, which are totally unrelated to Five Ten's rubber soles and rock-climbing, hiking, and water terrain shoes. *See S Indus. v. Hobbico, Inc.*, 940 F.Supp. 210, 212 (N.D.Ill.1996) (dismissing S Industries' complaint because the sporting goods listed in its registrations are "entirely different goods" than the defendants' fishing tackle floats); *GMI*, 1998 WL 67627 at *7 (finding S Industries' garage door locks unrelated to defendant's garage door openers). It is beyond dispute that consumers do not, for example, use tennis rackets, golf balls, basketballs, or bicycles in connection with climbing shoes or shoes designed for traversing river beds. Nor would the public believe that Five–Ten's rubber soles and high-end outdoor adventure shoes come from the same source that sells relatively inexpensive team and court sporting goods for activities such as golf, tennis, basketball, or bicycling. Judge Shadur's comments are particularly apropos:

> S [Industries'] lawyer continues to ignore the fundamental proposition that the perpetual monopoly that may be assisted (though it is not created) by the granting

---

**29.** The only exception is one advertisement for Five Ten's "Stealth Sandal," but even this ad

makes clear that STEALTH refers to the trademarked rubber on the sole.

of a federal trademark registration does not apply to a name or other mark in a vacuum, but attaches only to the use of the mark on specified goods—in this instance, not at all the type of goods that have been trademarked and are being marketed by defendants here.

*Hobbico*, 940 F.Supp. at 212.

The same rationale applies to SI and its licensees' unregistered goods, STEALTH team and court athletic shoes and hunting boots. Assuming for the moment that these goods are marketed as STEALTH products, the Stoller company catalogs feature an "athletic shoe," tennis shoes, and an "oxford" described as an "all around shoe," all of which retail in the $50 range. The PUMA Stealth shoes are high-topped basketball shoes that cost about $90. The Sportsman's Guide license agreement attaches an ad for a cold-weather hunting boot that is advertised for $29.97.[30] None of these products are related to or compete with $140 high-friction rubber-soled shoes designed for gripping mountain precipices or rocky riverbeds. Climbers and fly-fishers do not use tennis shoes, oxfords, or basketball shoes in pursuing their sports, just as basketball players, tennis players, and casual walkers would not purchase Five Ten's shoes for their activities. And the public would not associate the source of shoes designed for flat surfaces, team sports, or casual use with the source of shoes made for navigating vertical or rocky terrain. *See Knaack*, 955 F.Supp. at 1000 ("[D]issimilarity of products on a company-wide basis makes it even less likely that consumers would believe that the two product types come from the same source.").

In sum, SI's and its licensees' products serve a different purpose, target a different market, and sell at different price points than Five Ten's products. We feel the need to point out that SI does not enjoy a monopoly on STEALTH for all shoes—only for goods that are competitive with or related to its shoes. *See Clarks of England v. Glen Shoe Co.*, 485 F.Supp. 375, 378 (S.D.N.Y.1980) (denying preliminary injunction and finding no likelihood of confusion, in part, because "although both Glen and Clarks produce footwear, their shoes differ substantially. . . . the 'differences in appearance, style, function (and) fashion appeal demonstrate that the 'competitive distance' between [the parties'] shoes is substantial.") (quoting *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1130 (2d Cir.1979)). Courts have declined to find competitiveness in cases much closer that this one. *See, e.g., Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, 1996 WL 929597, at *18 (S.D.N.Y. Oct.21, 1996) ("although both Aerosoles and the shoes produced by Marlboro compete broadly in the lightweight flexible women's shoes market, their shoes are in a different segments of that market").

Our conclusion that SI and its licensees' and Five Ten's products are dissimilar is underscored by their contrasting channels of trade. Relevant to this determination is "whether there is a relationship in use, promotion, distribution or sales between the goods and services of the parties." *Forum Corp.*, 903 F.2d at 442. SI's distribution and sales methods are vastly different than Five Ten's. Stoller testified that his companies sell their sporting goods and shoes through catalogs, sales representatives, and at retail stores that sell a broad range of products, including Wal–Mart and K–Mart.[31] Stoller Dep. at 14–15. In contrast, Five Ten's climbing, approach and water terrain shoes appear only in boutique outdoor adventure stores, such as REI and Erehwon. There is no evidence that any retailer sells both parties' goods. While LL Bean sells its Aqua Stealth-soled boots through a specialized fly-fishing catalog, this channel of trade does not compare to the Stoller company catalogs, which advertise a wide variety of sporting goods and consumer electronic equipment.

**30.** The shoes marketed by SI's other two licensees, Cabela and Mitsushiba, are not described or pictured in the record. Cabela's license is for STEALTH on undefined "footwear," and Mitsushiba's is for golf shoes, goods totally unrelated to Five Ten's rock-climbing footwear.

**31.** The record contains no evidence on the sales, distribution, or promotional methods of SI's licensees, other than the 1990 Puma footwear catalog and some free-standing ads that do not bear proof of publication.

The parties' promotional techniques are likewise distinct. The Stoller companies promote their products through catalogs and sporting goods trade shows (e.g., the National Sporting Goods Trade Association show and the Sporting Goods Manufacturing Association show), as well as at licensing exhibitions (e.g., the Licensing Industry Merchandiser's Association show). Five Ten, however, promotes its products in specialty publications and trade shows targeted toward outdoor adventure and climbing enthusiasts (e.g., *Climbing* and *Rock & Ice* magazines and the Outdoor Retailer trade show). Neither party has encountered the other while attending their respective trade shows. And there is no evidence that the parties' ads have ever appeared in the same publication, or that the parties share any customers. In short, SI and Five Ten "have not come in contact with one another in the business world, except in court." *Knaack,* 955 F.Supp. at 1001.

### C. Degree of Care Exercised by Consumers

"[W]here consumers are sophisticated, deliberative buyers, confusion is less likely." *Rust Environment & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210, 1217 (7th Cir. 1997). Both the price and function of Five Ten's products make it clear that potential purchasers are sophisticated and exercise great care in deciding whether to buy the products. Selecting a shoe to wear for climbing treacherous peaks or for submersion in water requires careful examination and inquiry about the sole's gripping characteristics and ability to withstand these extraordinary uses—indeed, climbers' lives literally depend on the quality of their shoes. And at $140 a pair, customers will not make the purchase lightly.

Furthermore, there is no chance that potential purchasers will inadvertently buy (or even see) Five Ten's shoes and think that they are SI or its licensees', or otherwise be confused about source or affiliation. *See Forum Corp.,* 903 F.2d at 442 (court must consider "potential purchasers of both products"). Five Ten's shoes are prominently marked with the Five Ten brand name and

sold in specialty stores. Outside these stores, there is little chance that anyone will see the shoes anywhere other than mountainous, remote areas. In light of this, it is difficult to understand how anyone could be confused about the source of Five Ten's shoes or erroneously think that they were produced by companies that sell tennis shoes and team and court sporting goods.

In addition, the Stoller companies' tennis shoes, Puma's basketball shoes, The Sportsman's Guide's hunting boots, Five Ten's climbing and water terrain shoes, and LL Bean's fly-fishing shoes all have distinct functions. If a consumer wants to hunt, play basketball, or hit the tennis courts, she will look for shoes adapted to those activities, not accidentally walk into Erehwon and buy a climbing shoe or unwittingly pick up LL Bean's fly fishing catalog and order its Aqua Stealth-soled boot. There is no evidence that any of these shoes, particularly those in Five Ten's product line, are the subject of anything but deliberate, careful purchases. *See Knaack,* 955 F.Supp. at 1001 (a car cover is not "an impulse item which is purchased like an umbrella when it is raining outside"); *GMI,* 1998 WL 67627, at *8 (consumers "would not purchase a garage door on impulse as he would with less expensive products"). As such, this factor, like the others, weighs in favor of the defendants.

### D. Strength of the Mark

■ " '[T]he term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular ... source.' " *Sands, Taylor & Wood,* 978 F.2d at 959 (quoting *McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979)). Practically speaking, this merits two considerations: (1) the mark's inherent strength, that is, where it falls on the continuum between a generic and an arbitrary term; and (2) public association of the mark with a source. *See Telemed Corp. v. Tel–Med, Inc.,* 588 F.2d 213, 219 (7th Cir.1978) (mark strength depends on whether "the public has already been educated to accept it as the hallmark of a particular source"; whether

the mark is "distinctive in itself"; and whether it has been the subject of "wide and intensive advertisement") (internal quotations and citations omitted); *Knaack*, 955 F.Supp. at 1001–03 (analyzing inherent strength and public identification with a source in determining mark strength). "Only strong marks are entitled to protection against infringement by non-competing goods." *GMI*, 1998 WL 67627, at *8 (internal quotations and citations omitted).

 Inherent strength is determined according to a mark's categorization as (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful. *Telemed*, 588 F.2d at 216. The word STEALTH, as used by SI, is arbitrary. STEALTH does not serve as a proxy for Stoller companies or their licensees' goods, does not describe their goods, and is not suggestive of their goods' characteristics. *Cf. G. Heileman Brewing Co.*, 873 F.2d at 998 (beer manufacturer's use of "LA" is merely descriptive because it described the beer's "low alcohol" content). Indeed, the Stoller companies use STEALTH on all manner of unrelated products.

Any strength that STEALTH derives from its arbitrariness, however, is obliterated by the utter absence of evidence that the public associates this mark with any particular source, much less a good sold by SI or one of its licensees. SI has not provided any affidavits, testimony, or consumer survey evidence, for example, showing that consumers identify STEALTH with its products. *See Knaack*, 955 F.Supp. at 1003 ("Knaack's failure to produce any survey evidence or direct testimony from the relevant consumer group undermines its own ability to prove the strength of its mark in its own market."). Even crediting Stoller's claim that his company has been selling STEALTH products since 1981 does not aid SI because it fails to show that the public accepts STEALTH as "the hallmark of a particular source." *Telemed*, 588 F.2d at 219; *see Knaack*, 955 F.Supp. at 1001 ("The fact that Knaack has sold products under the WEATHER GUARD trademark for twenty-five years does not answer the question of whether the name resonates in the consumers' conscious-

ness."). We agree with Judge Kocoras that "[S Industries] has not provided any evidence that consumers associate the 'Stealth' name with one source when they see 'Stealth' products." *S Indus., Inc. v. GMI Holdings, Inc.*, 1998 WL 67627, at *8 (N.D.Ill. Jan. 30, 1998).

The failure of proof on public identification is not surprising given the dearth of evidence that SI or its licensees actually use STEALTH. We have Stoller company catalogs from the 1980's but nothing since then. We have a 1990 Puma footwear catalog and evidence of de minimus sales ($3235.34 paid as a royalty to Stealth Industries) in the same year. We have several license agreements executed in the 1990s permitting use of STEALTH on sporting goods, and three for use of the mark on footwear, but no evidence (except for the de minimus Puma sales in 1990) that the agreements were ever implemented or produced any revenue. *See GMI*, 1998 WL 67627, at *8 (finding STEALTH mark not strong due to small number of product sales); *S Indus., Inc. v. Centra 2000, Inc.*, 1988 WL 158067, at *5 (N.D.Ill. Mar. 31, 1998) (finding SENTRA mark "relatively weak" because SI showed little evidence of its own use and no evidence that license agreement to use the mark ever generated revenue). Given the apparent lack of use and public identification, we find that STEALTH is a weak mark.

SI's arguments to the contrary border on the frivolous. SI points to language in a district court opinion stating that SI's use of STEALTH has "created a distinctive designation of the origin of products on which it has been place [sic] and is widely recognized by the public." [32] But the court took this language from an earlier opinion on a motion to dismiss, which accepted the plaintiffs' allegations as true. SI's attempt to paint its own allegations as the factual finding of a court is nothing short of dishonest. Next, SI harps on the fact that the PTO has deemed its two registrations at issue in this case "incontestable." This is an equally misleading tactic because incontestability is insignificant in the mark strength calculation. *See*

---

**32.** *S Indus., Inc. v. World of Weapons*, 1997 WL 17796 (N.D.Ill. Jan.15, 1997).

*Knaack,* 955 F.Supp. at 1002 (plaintiff's incontestable registrations "creat[e] no presumption of strength in its mark nor do[ ] [they] broaden the scope of the mark's protection."). SI has tried this tactic before, without success. *See Hobbico,* 940 F.Supp. at 212 (finding SI's allegations of incontestability "really misleading because such incontestability has no significance at all under the circumstances.").

We also note that SI's success last year in persuading the PTO to cancel three third-party registrations for the STEALTH mark is irrelevant because the cancellations do not alter public perception. If anything, the fact that third parties had registrations for the STEALTH mark weakens it as a source identifier. *See Knaack,* 955 F.Supp. at 1003 (third-party use of mark demonstrates "lack of distinctiveness and strength") (citing cases). Likewise with SI's indiscriminate licensing program, which, assuming the agreements are in force, puts the STEALTH mark on all manner of goods without consistency and associates the mark with a vast number of brand names—diluting rather than building a source affiliation.

### E. Actual Confusion

SI's evidence of actual confusion is almost non-existent. It consists solely of self-serving hearsay testimony in Stoller's declaration and the perennially confused Nicholas Bianchi's affidavit. Stoller claims in his declaration that he has "experienced confused customers" at trade shows "who do not and cannot distinguish between" the parties' products. He also insists that he received one phone call from an unnamed person on an unspecified date complaining about the quality of Five Ten's shoes. The first statement is hearsay and therefore we ignore it. The second, though technically within the state-of-mind hearsay exception, is equally unreliable. *See Smith Fiberglass Prods., Inc. v. Ameron, Inc.,* 7 F.3d 1327, 1331 (7th Cir.1993) (refusing to consider plaintiff's employee's "vague hearsay account" that a customer asked whether the plaintiff made one of the defendant's products because it would "craft[ ] a new hearsay exception to the Federal Rules of Evidence for paraphrases of

state of mind declarations by unknown declarants"). Even if the phone call were reliable evidence, it is de minimus evidence of confusion that we need not consider. *Forum Corp.,* 903 F.2d at 443 ("Of course, as appellee points out, de minimus evidence of confusion may be discounted.").

Nicholas Bianchi's affidavit is just as ineffectual. He states that he called defendant REI in 1996 and "was informed that REI was selling a STEALTH athletic shoe with a rubber sole." He then claims to have called Stoller and asked whether SI was the supplier. Besides the fact that Bianchi never saw the shoes at REI and the REI representative never identified them as Five Ten's products, Bianchi's testimony is inherently unreliable and insufficient as a matter of law to support confusion. Bianchi's name has surfaced in several SI cases as a consumer who was "confused" about whether SI was the source of various products, including bug zappers, garage door openers, and radios. *See* Affidavit of Joseph Krieger (attaching Stoller Deposition excerpts from *S Indus. v. Ecolab, Inc.,* 1996 WL 715541(N.D.Ill. Dec. 6, 1996) and *S Indus. v. JL Audio, Inc. et al.;* and the court's opinion in *S Indus. v. GMI Holdings, Inc.*). We could not agree more with defendants' observation that "[n]o matter what the product at issue, Mr. Bianchi is allegedly confused." Even if we credited Bianchi's statements, they constitute inadequate, de minimus evidence of confusion. *See Door Sys.,* 83 F.3d at 173 ("[T]he plaintiff's evidence that two consumers (out of how many thousands?) may have been misled cannot by itself be thought to create a contestable issue of likelihood of confusion . . . .").

We also conclude that the parties' alleged concurrent use of STEALTH since 1988 without any instances of actual confusion weighs heavily against finding any likelihood of confusion. *Aktiebolaget Electrolux v. Armatron Int'l, Inc.,* 999 F.2d 1, 4 (1st Cir. 1993) ("[A]n absence of actual confusion, or a negligible amount of it, between the two products after a long period of coexistence on the market is highly probative in showing that little likelihood of confusion exists."); *Falcon Rice Mill, Inc. v. Community Rice*

*Mill, Inc.*, 725 F.2d 336, 347 n. 13 (5th Cir. 1984) ("[C]oncurrent use of two marks over a substantial length of time without actual confusion strongly suggests that there is no likelihood of confusion .").

### F. Intent to Palm Off

Finally, we reach the last factor, intent to palm off, which is defined as "trying to get sales from a competitor by making consumers think that they are dealing with that competitor, when actually they are buying from the passer off." *G. Heileman Brewing*, 873 F.2d at 1000. There is no evidence that Five Ten intended to "palm off" its products as those of SI or its licensees. Any suggestion to the contrary is plainly frivolous.

Our application of the seven-factor test for the likelihood of confusion thus reveals that every single one weighs in the defendants' favor. Not one factor presents even a close call. This is clearly a case in which "the evidence is so one-sided that there can be no doubt about how the question should be answered." *Door Sys.*, 83 F.3d at 171. Therefore, summary judgment on SI's Lanham Act claims—all of which require a likelihood of confusion—is appropriate.[33]

### III. SI's State-law Claims Fail Because They Track the Federal Claims

SI's Illinois Consumer Fraud and Deceptive Trade Practices Act and Illinois Uniform Deceptive Trade Practices Act claims are resolved in the same manner as Lanham Act claims. *D 56, Inc. v. Berry's Inc.*, 955 F.Supp. 908, 920 (N.D.Ill.1997). To prevail on them, SI must show that it has a protectable mark and that defendants' use of that mark is likely to cause confusion. *Thompson v. Spring–Green Lawn Care Corp.*, 126 Ill. App.3d 99, 104, 81 Ill.Dec. 202, 466 N.E.2d 1004, 1010 (1984). For the reasons above, we grant defendants summary judgment on these claims as well.

### IV. Defendants are Entitled to Attorneys' Fees and Defense Costs

Both the Lanham Act and the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Act") permit the court to award attorneys' fees to "prevailing parties." *See* 15 U.S.C. § 1117(a); 815 ILCS 505/10a(c). The Lanham Act adds that the case must be "exceptional," while Illinois courts and the Seventh Circuit have interpreted the Consumer Act to allow fees if "special circumstances" exist. *See Door Sys., Inc. v. Pro–Line Door Sys.*, 126 F.3d 1028, 1030–32 (7th Cir.1997) (discussing Illinois law). The Seventh Circuit recently elaborated on what a prevailing defendant must show to obtain fees under both statutes: that the plaintiff's suit was "oppressive." *See id.* 126 F.3d at 1031–32.

By way of example, the *Door Systems* court explained that "a suit can be oppressive because of lack of merit and cost of defending even though the plaintiff honestly though mistakenly believes that he has a good case and is not trying merely to extract a settlement based on the suit's nuisance value." *Id.* 126 F.3d at 1032 (citations omitted). The court warned that the standard is not bad faith, but rather "malicious, fraudulent, deliberate, or willful" conduct. *Id.* 126 F.3d at 1031 (internal quotations and citations omitted).

This suit clearly rises to that level, if not above it. In support of its claims, SI offered highly questionable (and perhaps fabricated) documents; testimony from its principal that was inconsistent, uncorroborated, and in some cases, demonstrably false; affidavits from career SI witnesses; and otherwise utterly inadequate evidence. The shocking fact remains that SI has no proof that the Stoller companies ever made or sold a STEALTH shoe—the very subject of the alleged infringement.

SI also tried repeatedly to misdirect the court by focusing on federal registrations for

---

**33.** SI raises several spurious arguments for the first time in its reply brief. Apart from the fact that these arguments are so lacking in merit that they deserve no mention, SI's failure to raise them until its reply constitutes a waiver. *See Strehl v. Case Corp.*, 1997 WL 695729, at *2

(N.D.Ill. Nov.4, 1997) ("A litigant who fails to raise an argument until his reply brief will be deemed to have waived that argument.") (quoting *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 439 (7th Cir.1994)).

goods or marks not at issue in this case, irrelevant PTO proceedings, and license agreements to use STEALTH on goods totally unrelated to the defendants' products. It is as if SI thought that the sheer paper weight of its submissions would magically mutate into probative proof. To respond to this paper storm of dubious evidence, defendants had to conduct a broad and, no doubt, expensive investigation. In addition, SI tried to inject bogus fact issues (despite having moved for summary judgment), misstated the evidence, and made frivolous legal arguments. This Court can think of few suits more oppressive, or few cases more exceptional, than this. As such, we award the defendants attorneys' fees and defense costs under both the Lanham Act and the Illinois Consumer Fraud and Deceptive Business Practices Act.

## CONCLUSION

It is our hope that this opinion curbs Stoller and his attorney's desire to continue their vexatious litigation trek. SI's pattern of receiving four adverse judgments that point out the questionable nature of its evidence and triggering two orders to pay attorneys' fees, *see S Indus., Inc. v. Diamond Multimedia Sys., Inc.,* 991 F.Supp. 1012, 1023–24 (N.D.Ill.1998), in the last six months leads us reluctantly to conclude that sanctions beyond awarding the defendants their attorneys' fees might be in order here.

For the foregoing reasons, we grant the defendants' motion for summary judgment in its entirety, and deny the plaintiffs' motion for summary judgment. Defendants are ordered to submit a petition for attorneys' fees and a bill of costs by July 29, 1998. The Clerk of Court is directed to enter judgment for the defendants and against the plaintiffs under Fed.R.Civ.P. 58. The Court will retain post-judgment jurisdiction to resolve the issues of appropriate attorneys' fees and costs.