**GARDEN OF LIFE, INC., Plaintiff,**

v.

**Barry LETZER, Sally Letzer, and Garden of Life LLC, Defendants.**

**No. 04–2619AHM(MANx).**

United States District Court, C.D. California.

May 10, 2004.

---

**14.** Docket number 19.

**15.** Docket number 18.

Ian C. Ballon, Manatt, Jonathan Michael Eisenberg, Jennifer A. Golinveaux, Manatt, Phelps & Phillips, Los Angeles, CA, for Garden of Life Inc., Plaintiff.

Judith L. Meadow, Larry C. Russ, Russ, August & Kabat, Los Angeles, CA, for Garden of Life LLC, Barry Letzer, Sally Letzer, Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

MATZ, District Judge.

This matter is before the Court on Plaintiff's motion for a preliminary injunction. For the reasons that follow, the Court grants Plaintiff's motion.

### FACTUAL AND PROCEDURAL BACKGROUND

Garden of Life, Inc. ("Plaintiff") is a "health and wellness" company that sells whole food nutritional supplements and disseminates publications about health, nutrition, fitness and diet. Plaintiff was incorporated in Florida in May 2000 by Jordan Rubin, the author of the holistic health book and New York Times bestseller "The Maker's Diet." Plaintiff sells its nutritional supplements primarily at health foods stores, in mail-order catalogues, through health care practitioners, through authorized internet distributors and on its own website, *www.gardenoflifeusa.com*. Plaintiff launched this website on May 4, 2001.

Plaintiff owns several trademarks related to its name, including the "Garden of Life" mark for dietary food supplements (registered on January 29, 2002), the "Garden of Life" logo and words for dietary food supplements (registered on April 29, 2003), and the "Garden of Life Extra Virgin Coconut Oil" mark (registered on February 17, 2004). *See Burger Decl., Exh. 2.* On December 2, 2003, Plaintiff filed a trademark application for registration of the "Garden of Life" mark in connection with the provision of information in the fields of health, nutrition, fitness and diet. *Id.*

Defendants are Barry and Sally Letzer ("the Letzers" or "Defendants"), a married couple. In July 1995, Sally Letzer incorporated a different company named Garden of Life, Inc. in Washington state. According to two Washington state License Renewal & Annual Reports signed by Sally Letzer, as of July 31, 2001 Garden of Life, Inc. had never conducted any business or earned any revenue. *See Golinveaux Decl., Exhs. 10, 11.* The Letzers appear to be the owners of Garden of Life, LLC, a Nevada corporation incorporated on April 1, 2004, and they do not challenge that assumption. Garden of Life LLC is also a defendant in this action.

On April 22, 1997, the Letzers registered the domain name *www.gardenoflife.com*. On November 12, 2002, Sally Letzer registered the trademark "Garden of Life Lessons" for "educational and entertainment services" relating to "understanding the importance of developing tools for living from the vantage point of merging the skills of intuitionism with the skill of mastering day to day real life issues and on the subject of thereby being aware of and articulating a stated desire, and on the subject to creating a design to enact that desire and implementing a delivery system that delivers one's stated

desire..." *Id., Exh. 12.* On April 11, 2004, the Letzers filed an application for the "Garden of Life" trademark in International Classes 21 and 44.[1]

The facts giving rise to this dispute began in November 2000 when Plaintiff became aware that the Letzers owned the domain name *www.gardenoflife.com* and offered to purchase it from them. Plaintiff and the Letzers engaged in sporadic negotiations over the next few years. On December 1, 2003, an attorney for the Letzers offered to sell the domain name to Plaintiff for $3,920,000. On December 20, 2003, Plaintiff made a counteroffer of $25,000.[2] Thereafter, negotiations broke down.

During November—December, 2003, while Plaintiff and the Letzers were negotiating for the domain name *www.gardenoflife.com,* the Letzers registered at least 33 additional domain names that contained variations on the phrases "Garden of Life" and "Garden of Life USA."[3] Although some of these websites were inactive and merely posted "under construction" signs, other sites redirected traffic to either other websites (incorporating the phrase "Garden of Life") owned by the Letzers, or to a website owned by the Letzers that contained links to websites owned by third parties who paid the Letzers a referral fee for each web-user who clicked on the link. In addition, at some point in time between November 2003 and April 2004, the Letzers registered an additional 48 domain names incorporating the phrases "Garden of Life" and "the Maker's Diet."[4] At the hearing on this motion, counsel for Defendants represented that the Letzers own a total of 75 domain names that incorporate the phrase "Garden of Life" or "The Maker's Diet." Many of these domain names, including *www.gardenoflife.com.* were formally registered to "b aware nation," a business entity owned by the Letzers.

The most contested of the Letzers' 75 domain names is *www.gardenoflife.com.* Between 1997 (when the Letzers registered the domain name) and February 2004, no active website existed at the address. The website simply posted an "under construction" sign. *See Golinveaux Decl.* ¶ 13. However, in February 2004, two months after Plaintiff made its $25,000 counteroffer, the Letzers launched an active website that prominently displayed the name "Garden of Life" and explained that Garden of Life was a company "Providing Wholistic Living and Vibrant Health through the Newly Centered Principles and Technologies of Balanced Wellness SINCE 1974." *See Stone Decl., Exh. 3.* The website also contained a message board on which readers could post messages and ask for advice. *Id., Exh. 2.* At the end of March 2004, the Letzers removed the message board.

---

1. The record does not indicate what goods or services international classes 21 and 44 pertain to.

2. The Letzers, in their opposition to this motion, contend that Plaintiff's counteroffer was for $250,000 rather than $25,000. However, Plaintiff has provided the Court with a copy of its counteroffer letter, which states that the amount of the counteroffer was $25,000. *See Craven Decl., Exh. 2.*

3. These domain names include: *www.gardenoflifeusa.biz;* *www.agardenoflifeusa.biz;*

*www.gardenoflifeusa.net;* *www.agardenoflifeusa.com;* *www.gardenoflifeusa.org;* *www.agardenoflifeusa.net;* *www.gardenoflifeusa.us;* *www.thegardenoflifeusa.com;* *www.agardenoflifeusa.org;* www.4gardenoflife.org; *www.thegardenoflife.org;* *www.agardenoflife.com;* *www.gardenoflifecommunications.biz;* *www.gardenoflifecommunications.com;* and *www.gardenoflifecommunications.org.*

4. These websites include: *www.gardenoflifedietmaker.com;* *www.gardendietmaker.com;* and *www.gardenoflifediet.com.*

On April 4, 2004 (three days after incorporating Garden of Life LLC), the Letzers changed the registration information for *www.gardenoflife.com* and for 14 of their other domain names containing the phrase "Garden of Life." The Letzers changed the owner of these domain names from "b aware nation" to Garden of Life LLC. *See Golinveaux Decl., Exhs. 6, 15.*

On April 7, 2004, the Letzers redesigned their *www.gardenoflife.com* website. *See Stone Decl.* ¶ 3. The new website retained the title "Garden of Life" and referred to itself as "[T]he Real and True Garden of Life." *See Stone Decl., Exh. 3.* The website also contained a prominent banner ad which featured photographs of Garden of Life nutritional supplements (*i.e.*, Plaintiff's products) and links to third party websites that sold those products. *Id.* Also below the advertisement were links to the websites: *www.christ-diets.com* and *www.fakersdiet.net.*

The redesigned website also contained article headings linked to articles on a variety of topics. One heading read: "Who's the Real 'MAKER' of these 'Diets of Deception'?" A second heading read: "What's in those Supplements Anyway. Do you really know what's even in all those different vitamins and supplements you take? Have you ever heard of the Ancient Ingredient, PURE PROFIT?... is what's inside those capsules..." If a web-user clicked on the link to the article under that second heading, he was directed to another website owned by the Letzers, which contained links to "the best sites" on diet pills (including phentermine, popularly known as phen-phen), pain pills, sleeping pills, and other prescription and non-prescription medications. *Id., Exh. 4.*

The following day, on April 8, 2004, Plaintiff sent the Letzers a cease-and-desist letter demanding that the Letzers take down the *www.gardenoflife.com* website, transfer to Plaintiff some of the other websites with domain names containing the phrase "Garden of Life USA," provide Garden of Life with copies of all of the messages that individuals had posted on *www.gardenoflife.com*'s message board, and provide written assurance that the Letzers would stop using confusing references to Garden of Life. *Id., Exh. 7.* The Letzers did not respond to the cease and desist letter.

However, on April 9, 2004, the Letzers made some changes to the content of *www.gardenoflife.com*, including removing the reference to "the real and true garden of life," the photographs of and advertisements for Plaintiff's products and the articles about "Diets of Deception" and the content of nutritional supplements. *See Stone Decl., Exh. 8; Notice of Errata, Exh. 8.*

As of May 2, 2004, *www.gardenoflife.com* contained language soliciting readers to post paid advertisements on the site. The solicitation read: "Greetings good people of Garden of Life. Try this ever expanding targeted traffic. Do you want to make money today? Advertise here to reach your target market * * * Garden of Life customer * * * " *See Reply* at 8; *Notice of Errata, Exh. F.*

As a result of this course of events, on April 14, 2004, Plaintiff filed suit against the Letzers and Garden of Life LLC, alleging: (1) unfair competition under the Lanham Act; (2) cybersquatting; (3) federal trademark dilution; (4) federal trademark infringement; (5) unfair competition under Cal. Bus. & Prof.Code § 17200; (6) false advertising under Cal. Bus. & Prof. Code § 17500; (7) trademark dilution under Cal. Bus. & Prof.Code § 14330; (8) common law unfair competition; (9) common law misappropriation; and (10) common law trademark infringement.

Plaintiff now moves for a preliminary injunction, enjoining the Letzers from do-

ing, and ordering the Letzers to do, the following, pending a final judgment in this case:

(1) not advertise or offer for sale any goods or educational materials related to health, fitness, wellness, diet, nutrition, nutritional supplements, cosmetics, health and beauty aids or personal hygiene in connection with or under Plaintiff's Garden of Life trademarks or any confusingly similar mark or domain name;

(2) not represent that their products or services are affiliated with or endorsed by Plaintiff;

(3) not advertise or otherwise depict Plaintiff's goods or services without posting a disclaimer that they are not authorized distributors and are not affiliated with Plaintiff;

(4) not pass off any goods or services as "genuine" Garden of Life goods or services unless they are;

(5) not engage in any acts that dilute Plaintiff's trademarks or interfere with Plaintiff's business relationships, customers or goodwill;

(6) not register, purchase, sell, transfer or traffic in any domain names containing the phrase "Garden of Life" (except for "Garden of Life Lessons");

(7) take down and transfer to Plaintiff the *www.gardenoflife.com* domain name as well as the additional domain names that incorporate the phrase "Garden of Life";

(8) provide Plaintiff with complete copies of all misdirected communications intended for Plaintiff;

(9) post prominent links on all of its remaining websites *redirecting* traffic intended for Plaintiff to its website at *www.gardenoflifeusa.com;*

(10) file a declaration with the Court identifying any other domain names

that the Letzers registered, used, trafficked in or controlled that contain the words "garden" and "life";

(11) not use on any of their websites depictions of, postings about or references to Plaintiff, its trademarks, Jordan Rubin, or Plaintiff's services, goods, officers, directors or employees;

(12) post on their websites a disclaimer stating that the Letzers are not affiliated in any way with Plaintiff, and a link to *www.gardenoflifeusa.com;* and

(13) file a declaration with the Court setting forth all steps that the Letzers have taken to comply with the Order.

*See Plaintiff's Proposed Preliminary Injunction.*

In response to Plaintiff's motion for a preliminary injunction, the Letzers have provided the Court with a modified version of a preliminary injunction into which they are willing to enter. The Letzer's proposed preliminary injunction would enjoin the Letzers from:

(1) advertising or offering for sale any goods or services related to vitamins, nutritional supplements, or educational materials relating to the benefits of vitamins or nutritional supplements in connection with Plaintiff's Garden of Life trademarks;

(2) representing that the Letzers or their goods or services are affiliated in any way with Plaintiff;

(3) passing off any goods or services as genuine Garden of Life goods and services if they are not; and

(4) transfer to Plaintiff 36 of its domain names that reference "Garden of Life" or "The Maker's Diet," *not* including *www.gardenoflife.com.*

*See Defendants' Proposed Preliminary Injunction.*

Plaintiff contends that the Letzers' proposed preliminary injunction does not adequately protect it because it is far narrower in scope than its own proposed injunction. Plaintiff appears to be most upset that the Letzer's proposed preliminary injunction does not order the Letzers to transfer, or at least to take down, the website located at *www.gardenoflife.com.*

## ANALYSIS

### A. The Legal Standard for a Motion for a Preliminary Injunction.

In order to obtain a preliminary injunction in a trademark case, a plaintiff must demonstrate either: (1) a probability of success on the merits and the possibility of irreparable injury; or (2) the existence of serious questions going to the merits and a balance of hardships that tips sharply in its favor. *See GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199 (9th Cir.2000). "This analysis creates a continuum: the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." *Southwest Voter Reg. Educ. Project v. Shelley,* 344 F.3d 914, 918 (9th Cir.2003); *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215 (9th Cir.1987).

In trademark infringement cases, if the plaintiff demonstrates a likelihood of success on the merits (by showing a likelihood of confusion), the Court will presume irreparable injury because trademark damages are, by their very nature, irreparable. "This presumption effectively conflates the dual inquiries of this prong into the single question of whether the plaintiff has shown a likelihood of success on the merits." *GoTo.com,* 202 F.3d at 1205 n. 4 (2000).

### B. Plaintiff is Entitled to a Preliminary Injunction.

Plaintiff contends that it is likely to succeed on the merits of its claims for (1) unfair competition; (2) cybersquatting; (3) trademark dilution; and (4) trademark infringement. The Letzers have filed a "necessarily limited opposition" due to their "limited financial resources." *Opp.* at 1. The Letzers' only argument in opposition is that Plaintiff cannot prevail on any of the abovementioned causes of action because the Letzers are the senior users of the "Garden of Life" mark. The Letzers argue that it is Plaintiff that is "usurping [their] longstanding goals of providing services and products in the health and wellness area," rather than the other way around. *Id.* at 2. The Letzers urge the Court to adopt their more limited proposed preliminary injunction.

The Court finds that Plaintiff is likely to succeed on the merits of its claim of being the senior user of the "Garden of Life" mark and on the merits of its cybersquatting and trademark infringement claims.

### 1. Plaintiff Has Established a Likelihood of Success on its Claim that it is the Senior User of the "Garden of Life" Mark.

As a preliminary matter, the Court must determine whether Plaintiff has a valid, protectable interest in the "Garden of Life" mark. If Plaintiff does not, then it has no right to enjoin the Letzers from using the mark.

"It is axiomatic in trademark law that the standard test of ownership is priority of use. To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Sengoku Works, Ltd. v. RMC Int'l, Ltd.,*

96 F.3d 1217, 1219 (9th Cir.1996). The Lanham Act defines "use in commerce" as follows:

The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce—

(1) on goods when—

(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

(B) the goods are sold or transported in commerce, and

(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127.

■ Registration of a mark on the Principal Register at the Patent and Trademark Office ("PTO") "constitutes prima facie evidence of the validity of the registered mark and of [the registrant's] exclusive right to use the mark on the goods and services specified in the registration." *Brookfield Comm., Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1047 (9th Cir.1999). However, the mere registration of a mark does not extinguish any common law rights in the mark that a non-registrant may have previously acquired. *See Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 435 (7th Cir.1999). A non-registrant may rebut the presumption that the registrant has the right to exclusive use of the mark

by showing, by a preponderance of the evidence, that it was the first to use the mark in commerce and that it has made continuous use of the mark since then. *See Brookfield*, 174 F.3d at 1047; *Sengoku Works*, 96 F.3d at 1219; *Casual Corner Assoc., Inc. v. Casual Stores of Nevada, Inc.*, 493 F.2d 709, 712 (9th Cir.1974). "To be a continuing use, the use must be maintained without interruption." *Casual Corner*, 493 F.2d at 712. "Trademark rights are not created by sporadic, casual, and nominal shipments of goods bearing a mark. There must be a trade in the goods sold under the mark or at least an active and public attempt to establish such a trade." *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1274 (2nd Cir.1974). Therefore, "[m]ere adoption of a mark without bona fide use, in an attempt to reserve it for the future, will not create trademark rights." *Blue Bell, Inc. v. Farah Manuf. Co., Inc.*, 508 F.2d 1260, 1267 (5th Cir.1975).

■ The Letzers contend that they own the common law rights to the "Garden of Life" mark and that they began using that mark in commerce long before Plaintiff registered or used the mark. Therefore, the Letzers contend, they are the senior users of the mark. The Letzers base this argument on the following facts, which are set forth entirely in Barry Letzer's declaration:

The Letzers began operating a business called "Garden of Life" in California in 1974. *See Barry Letzer Decl.* ¶ 4. At that time, the business manufactured and sold devices for growing sprouts at home, as well as health food products, such as natural grains, legumes and seeds used in sprouting. *Id.* ¶ 5. The business sold its sprouting products in interstate commerce until 1978, when its main distributor went out of business, and thereafter it sold its products only sporadically until 2001. *Id.*

¶¶ 7, 8. Between 1974 and 1984, the business also held seminars and raw food clinics about the health benefits of sprouting and raw foods diets. *Id.* ¶ 6. In addition, from an unspecified time, "on and off" until 1988, the business sold water purifiers, air purifiers, specialized exercise equipment, dehydrated foods and personal care products under the trade name "Garden of Life." *Id.* ¶ 10.

Beginning in 1992, and lasting until 2003, the business offered health and wellness seminars under the name "Garden of Life Lessons." *Id.* ¶ 13. These seminars were "based on the value of looking at the Garden of Life as a metaphor for the delivery of the goodness within our whole life and the need to construct that life based on an expanded vision of many of the same principles of goodness within the essence of health and wellness." *Id.* However, for six years beginning in 1996, due to the illnesses and deaths of various of the Letzers' family members, the business's educational endeavors were "placed on the back burner." *Id.* ¶¶ 23–24. During that time, the Letzers held only occasional seminars.

On April 22, 1997, the Letzers registered the *www.gardenoflife.com* domain name. *Id.* ¶ 19. In August of 1997, Sally Letzer applied to the PTO for the trademark "Garden of Life Lessons." *Id.* ¶ 18. (Because she was unable to show use in commerce, she did not obtain the registration until November 12, 2002.) Also in 1997, the Letzers procured the toll free phone number: 1 888 4GARDEN.

On April 11, 2004, the Letzers filed an application with the PTO for the "Garden of Life" mark in international classes 21 and 44.

■ Barry Letzer's self-described use of the mark "Garden of Life" is insufficient to confer common law trademark protection for the following reasons. First, the Letzers have not demonstrated that they sold products or provided services under the name "Garden of Life" *continuously* before and up until the year 2000 (when Plaintiff began using the mark). For example, although Barry Letzer states in his declaration that Garden of Life sold sprouting devices between 1974 and 1978, he does not describe how frequently the business made sales, how many sales it made, to whom the sales were made or whether any sales were made to out-of-state customers. Moreover, Barry Letzer admits that the business's sales between 1978 and 2001 were "sporadic." He also admits that the business's sale of other products, such as air purifiers, was only "on and off" from some unspecified point in time until 1988. In addition, although Mr. Letzer declares that the business held seminars regarding the benefits of raw food diets between 1974 and 1984, he does not mention how often the seminars were held, where they were held, the extent of their attendance, or whether they were held in more than one state. Similarly, with regard to the health and wellness seminars held under the name "Garden of Life Lessons" between 1992 and 2003, Mr. Letzer does not indicate how frequently they were held, where they held, how many people attended, and whether they were held in more than one state. Mr. Letzer's statement that between 1996 and 2002, the business's educational endeavors were placed "on the back burner" suggests that these health and wellness seminars were held infrequently.

Mr. Letzer's declaration testimony is also completely unsubstantiated. For example, Mr. Letzer has not proffered any invoices from the business's sales, business cards, tax returns, copies of business plans or advertisements, or any other documentation that would substantiate his claim that Garden of Life, Inc. engaged in substantial and continuous business activities between 1974 and 2000. Nor did Mr. Let-

zer proffer an incorporation certificate verifying that in 1974, there actually existed a business called "Garden of Life."

The evidence presented by Plaintiff contradicts Barry Letzer's declaration testimony that the Garden of Life, Inc. conducted continuous business activity since 1974. First, Plaintiff has proffered a certificate of incorporation indicating that the Letzers incorporated Garden of Life, Inc. in 1995, not in 1974. (Although it is possible that the Letzers incorporated two separate companies called Garden of Life, Inc. in different states, there is no evidence that they did so.) Second, in a letter written by Sally Letzer to the Washington state Treasurer, which is attached to a State of Washington License Renewal & Annual Report filed by Sally Letzer on October 21, 2000 for Garden of Life, Inc. (the business incorporated in Washington in 1995), Sally Letzer wrote: "I have done no business or revenue since opening the business and do not plan to do any business or revenue for the next twelve months (as of 10/21/2000). I am enclosing $19.00 to keep the corporation active until I notify you of any change." *See Golinveaux Decl. ¶ 9, Exh. 10.* A similar letter is attached to a State of Washington License Renewal & Annual Report filed by Sally Letzer on July 31, 2001. The letter states: "I have done no business or revenue since opening the business and do not plan to do any business or revenue for the next 12 months. I am enclosing $19.00 to keep the corporation alive until I notify you of any change." *See Golinveaux Decl. ¶ 10; Exh. 11.*

Barry Letzer's vague, unsubstantiated and contradicted declaration testimony does not establish that the Letzers have continuously used the name "Garden of Life" in commerce since 1974. *See 15 U.S.C. § 1127; Casual Corner,* 493 F.2d at 712 (holding that defendant's failure to use the mark in commerce during a one-year

period prevented a finding of continuous use); *S Industries, Inc. v. Stone Age Equip.,* 12 F.Supp.2d 796, 805–06, 809 (N.D.Ill.1998) (holding in part that the unsupported declaration testimony of plaintiff's president about when his business began using the contested mark was merely self-serving and thus was insufficient to create a factual issue about senior use of the mark); *Sheila's Shine Products, Inc. v. Sheila Shine, Inc.,* 486 F.2d 114, 124, 125 (5th Cir.1973) (sporadic and occasional sales were insufficient to establish continuous use of the mark); *Zazu Designs v. L'Oreal,* 979 F.2d 499 (7th Cir.1992) (same).

██ Second, even assuming that the Letzers conducted business continuously under the Garden of Life name from 1974–2000, Barry Letzer's declaration testimony does not establish that the Letzers used the trade name "Garden of Life" as a trademark. The Lanham Act requires that to constitute a trademark, the mark must be placed on "the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto... or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale." *15 U.S.C. ¶ 1127.* With regard to services, the Lanham Act requires that the mark be "used or displayed in the sale or advertising of services." *Id. See also S Industries,* 12 F.Supp.2d at 808 (holding that the plaintiff could not establish senior use of the contested mark in part because there was no evidence that its goods actually bore the mark); *Avakoff v. Southern Pacific Co.,* 765 F.2d 1097, 1098 (Fed.Cir.1985)("Mere advertising of a product and documentary use of a symbol apart from the goods does not constitute trademark use.") Barry Letzer's declaration testimony does not establish that the mark "Garden of Life" ever appeared on any goods Defendants sold, or on the containers, tags, labels or documents associat-

ed with those goods. Nor does his declaration testimony establish that the mark was used or displayed in advertising the company's educational services. For all of these reasons, the Letzers have not established, by a preponderance of the evidence, that they acquired common law trademark rights in the mark "Garden of Life" in connection with health and wellness related goods and services.

In contrast, Plaintiff has demonstrated that it has used the Garden of Life mark continuously in commerce since May 18, 2000. Since that time, Plaintiff has sold nutritional supplements bearing the mark "Garden of Life," and grossed over $40,000,000. *See Burger Decl.,* ¶ 7, *Exh. 1.* Its products are sold in all fifty states. *Id.* ¶ 7. Plaintiff has also spent approximately $6,000,000 advertising and promoting its products, including in natural foods and health-related magazines. *Id.* ¶ 6. Plaintiff demonstrates that it sells its products through health food stores, health-care practitioners, authorized internet distributors and on its own website. *Id.* ¶¶ 4, 8. Plaintiff has provided the Court with pictures of its products (showing the Garden of Life mark affixed to the products) and copies of its advertisements (also displaying products bearing the mark). *Id., Exhs. 1, 3.* Plaintiff owns several trademark registrations related to its products and has provided the Court with copies of its trademark applications and registrations. *Id., Exh. 2.* For all of these reasons, the Court finds that Plaintiff has established a likelihood of succeeding on its claim of being the senior user of the "Garden of Life" mark in connection with health and wellness related goods and services.

### 2. *Plaintiff Has Demonstrated a Likelihood of Success on its Cybersquatting Claim.*

"Cybersquatting is the Internet version of a land grab. Cybersquatters register well-known brand names as Internet domain names in order to force the rightful owners of the marks to pay for the right to engage in electronic commerce under their own name." *Interstellar Starship Services v. Epix, Inc.,* 304 F.3d 936, 946 (9th Cir. 2002). According to the Senate Report accompanying the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), cybersquatters are those who: (1) "register well-known domain names in order to extract payment from the rightful owners of the marks;" (2) "register well-known marks as domain names and warehouse those marks with the hope of selling them to the highest bidder;" (3) "register well-known marks to prey on customer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site;" and (4) "target distinctive marks to defraud customers, including to engage in counterfeiting activities." *S.Rep.No. 106–140 at 5–6* (quoted in *Lucas Nursery and Landscaping, Inc. v. Grosse,* 359 F.3d 806, 809 (6th Cir.2004)). A cybersquatter is liable under ACPA if he:

(i) has a bad faith intent to profit from that mark . . . ; and

(ii) registers, traffics in, or uses a domain name that—

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

(III) is a trademark, word, or name protected by reason of section 706 of Title 18 [the Red Cross] or section 22056 of Title 36 [the Olympics].

*See 15 U.S.C. § 1125(d)(1)(A).* ACPA lists nine non-exclusive factors for courts to consider in determining whether a defen-

dant "has a bad faith intent." *15 U.S.C. § 1125(d)(1)(B)(I)*. These factors are:

(I) the trademark or other intellectual property rights, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert customers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of regis-tration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

*15 U.S.C. § 1125(d)(1)(B)(I)*. ACPA also contains a safe harbor which provides: "Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." *15 U.S.C. § 1125(d)(1)(B)(ii)*.

Plaintiff contends that Defendants are committing cybersquatting because they registered most of the domain names after Plaintiff's "Garden of Life" mark became distinctive and only after negotiations between the parties had begun for the *www.gardenoflife.com* domain name; because Defendants are using the domain names to divert traffic from its website and capitalize on Plaintiff's business good will to earn referral fees from third party websites that are linked to their websites; and because Defendants registered the 74 websites in order to extort a larger amount of money from Plaintiff for the similarly-named *www.gardenoflife.com* website. Defendants do not oppose these arguments, except to argue that Plaintiff is not the senior user of the "Garden of Life" mark. (The Court has already rejected this argument.) The Court agrees that Defendants have likely engaged in cybersquatting by registering 74 additional domain names that are similar to Plaintiff's mark. However, because Defendants registered the domain name *www.gardenoflife.com before* Plaintiff's Garden of Life

mark became distinctive (and indeed, before Plaintiff even began doing business), the following discussion does *not* apply to the *www.gardenoflife.com* domain name.

### a. Plaintiff's mark was Distinctive Before Defendants Registered Most of the Domain Names.

A mark is distinctive if people associate the mark with a particular source. *See Carter–Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794 (9th Cir. 1970); *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817 (9th Cir.1980); *15 U.S.C. § 1125(c)(1)*. As discussed above, Plaintiff has provided evidence that it has been continuously using the "Garden of Life" mark in commerce since 2000, it has grossed approximately $40,000,000 doing so, it has spent approximately $6,000,000 advertising its products and services, its founder, Jordan Rubin, has published the New York Times bestseller "The Maker's Diet," and its products are sold in health food stores, on the internet and through health food practitioners. This is ample evidence that by November 2003, when Defendant began registering the 70+ domain names containing variations on the phrase "Garden of Life," the public already associated the goods sold under the "Garden of Life" mark with Plaintiff.

### b. Defendants' Domain Names Are Confusingly Similar to Plaintiff's Mark.

The 74 additional domain names registered by Defendants are also confusingly similar to Plaintiff's "Garden of Life" mark because most of them contain slight variations on the phrase "Garden of Life." Some of the domain names even mimic more closely Plaintiff's website, *www.gardenoflifeusa.com*, by including variations on the phrase "Garden of Life USA." Others, such as the domain names that are variations on the phrase "The Maker's Diet," are confusing because they refer-

ence a book authored by Plaintiff's founder, Jordan Rubin. In short, the domain names are likely to confuse web-users into mistakenly believing that they—the domain names—are somehow affiliated with Plaintiff. As described below in the section on trademark infringement, Plaintiff has proffered substantial evidence that many web-users actually have suffered confusion.

### c. Defendants Likely Had a Bad Faith Intent When They Registered the Domain Names.

Plaintiff has also provided evidence that the Letzers' conduct satisfies many of the bad-faith factors. To begin with, Plaintiff (not Defendants) owns the trademark rights in the mark used in the domain names. *15 U.S.C. § 1125(d)(1)(B)(i)(I)*. Second, all of the domain names are nearly identical, or are at the least, confusingly similar to Plaintiff's mark and domain name. *15 U.S.C. § 1125(d)(1)(B)(i)(VIII)*. Third, Defendants did not begin registering the domain names until negotiations began for the domain name *www.gardenoflife.com*. The timing and large number of the domain name registrations suggest that Defendants registered them only to put pressure on Plaintiff to purchase the *www.gardenoflife.com* domain name and to pay more money for it. *See Epix*, 304 F.3d at 947 (in certain circumstances, offers to sell a contested domain name may be probative of bad faith); *Lucas Nursery*, 359 F.3d at 811 (the registration of multiple domain names is "central to a finding of bad faith"); *E & J Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270 (5th Cir.2002) (noting that when a registrant first uses a website after litigation begins, it suggests that the registrant is acting in bad faith); *15 U.S.C. § 1125(d)(1)(B)(i)(III), (VI)*. Fourth, Defendants appear to be using some of these domain names solely to ob-

tain reference fees (*i.e.,* to make money from a third party each time a web-user clicks on a link that takes it to the third party's website), and not for any bona fide offering of goods or sales. *Id.* Fifth, Barry Letzer's own explanation does not reflect a genuinely good faith reason for registering the domain names. Barry Letzer states in his declaration that because he was under the impression that Plaintiff was encroaching on his business, "as many businesses do in similar situations...it was necessary to register as many variations or 'near misses' of [Plaintiff's] domain name as possible to prevent further encroachment [sic] Plaintiff and others on their domain name. Thus, we decided that we had to protect our own territory and so we began registering additional domains..." *Barry Letzer Decl.* ¶ *39.* Finally, even if Barry Letzer's stated reason for registering the domain names could constitute a good faith reason, his registration of multiple domain names containing variations on "The Maker's Diet" reeks of bad faith because "The Maker's Diet" has nothing to do with any of Defendants' claimed business activities. *See Virtual Works, Inc. v. Volkswagen of America, Inc.,* 238 F.3d 264 (4th Cir.2001) ("A defendant who acts even partially in bad faith in registering a domain name is not, as a matter of law, entitled to benefit from [ACPA's] safe harbor provision.") For all of these reasons, Plaintiff has demonstrated a likelihood of success on its cybersquatting claim.

3. *Plaintiff Has Also Demonstrated a Likelihood of Success on its Trademark Infringement Claim.*

■■■ "The core element of trademark infringement is the likelihood of confusion, i.e., whether the similarity of the marks is likely to confuse customers about the source of the products." *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1053 (9th Cir.1999) (quoting *E & J Gallo Win-*

*ery v. Gallo Cattle Co.,* 967 F.2d 1280, 1290 (9th Cir.1992)). In the internet context, several types of confusion that may occur. First, a web surfer who intends to access the senior user's website but instead accesses the junior user's website may be confused regarding the ownership of the website, and may mistakenly believe that the senior user sponsors the junior user's site, or that the two companies are somehow related, or that the junior user is the source of the senior user's products. *Id.* at 1057. The danger resulting from this type of confusion is that "the senior user loses the value of the trademark—its product identity, corporate identity, control over its good will and reputation, and ability to move into new markets." *Nat'l Customer Engineering, Inc. v. Lockheed Martin Corp.,* 43 U.S.P.Q.2d 1036, 1038, 1997 WL 363970 (C.D.Cal.1997) (quoting *Ameritech, Inc. v. American Information Technologies Corp.,* 811 F.2d 960 (6th Cir. 1987)). A second type of confusion is that a web surfer may wrongly assume that the senior user no longer exists, and it may use the junior user's site instead. *See Brookfield,* 174 F.3d at 1057. A third type of confusion is that the web surfer may realize that he has accessed the wrong site but then become discouraged and cease searching for the senior user's site. *See Epix,* 304 F.3d at 941.

■■■ Courts in the Ninth Circuit apply the eight-factor *Sleekcraft* test to analyze the likelihood of confusion in trademark infringement cases. *See AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979); *Epix,* 304 F.3d at 942. The eight factors are: (1) the strength of the mark; (2) the proximity of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's

intent in selecting the mark; and (8) the likelihood of expansion of the product lines. *Id.* Although a court must balance all of these factors, in the internet context, the three most important factors are: (1) the similarity of the marks; (2) the relatedness of the goods and services; and (3) the simultaneous use of the internet as a marketing channel. *See GoTo.com*, 202 F.3d at 1205. "When this 'controlling troika,'... or internet trinity, 'suggests confusion is...likely,' the other factors must 'weigh strongly' against a likelihood of confusion to avoid the finding of infringement." *Epix*, 304 F.3d at 942 (quoting *GoTo.com*, 202 F.3d at 1205, 1207). The Court finds that this triad of factors weighs in favor of confusion and the remaining factors do not weigh strongly against it.

### a. The Similarity of the Marks.

▮▮▮▮ The greater the similarity between two marks, the greater the likelihood of confusion. *See GoTo.com*, 202 F.3d at 1206. "In analyzing this factor, 'the marks must be considered in their entirety and as they appear in the marketplace.'" *Brookfield*, 174 F.3d at 1054 (citations omitted). From the limited information provided to the Court, Defendants' allegedly infringing "Garden of Life" mark is very similar to Plaintiff's "Garden of Life" mark. The actual words "Garden of Life" in both parties' marks are identical. However, the presentation of the marks differs. On Plaintiff's website and products, the words "Garden of Life" appear inside of a horizontal, tubular oval, which is encapsulated in a larger circle filled with pictures of fruits and vegetables. *See Burger Decl., Exhs. 1, 3.* The lettering is white and the tube surrounding the lettering is dark blue. *Id.* In contrast, on Defendant's website, the mark "Garden of Life" is floating in a jungle-like scene. *See Stone Decl., Exhs. 3, 5, 6.* Both the lettering and the surrounding jungle scene are multicolored. *Id.* Because Defendants do not appear to be currently selling any products on their website or through any other channel, and because neither party has proffered pictures of any of the products that Defendants sold in the past, the Court cannot determine what the mark on Defendants' products looks like, if it appears on the products at all. However, because the wording of the two marks is identical, this factor weighs in favor of a finding of confusion.

### b. The Relatedness of the Goods and Services.

▮▮▮▮ Related goods are more likely to confuse the public about the source of those goods than are unrelated goods. *See Brookfield*, 174 F.3d at 1055. "The parties' goods need not be identical or directly competitive, however, for there to be a likelihood of confusion. They need only be related in some manner, or the conditions surrounding their marketing be such that they could be encountered by the same purchaser under circumstances that could give rise to the mistaken belief that the goods come from a common source." *Lockheed Martin*, 43 U.S.P.Q.2d at 1039.

▮▮▮ Plaintiff, on its website and through other retail outlets, sells nutritional supplements. Plaintiff's website also provides health and wellness-related educational information, such as information on how to improve digestion, healthy recipes and other healthy lifestyle habits. The Court lacks information about what goods, services or information, if any, Defendants are currently offering to the public. It appears from the excerpts of Defendants' website, *www.gardenoflife.com*, that Defendants are not currently selling anything on their website. Instead, their website contains merely ephemeral language regarding gardens, love and life. However, Defendants' website does refer to Defen-

dant's business as "Providing Wholistic [sic] Living and Vibrant Health through the Newly Centered Principles and Technologies of Balanced Wellness." *See Stone Decl., Exh. 5.* In addition, according to Barry Letzer's declaration testimony, Defendants' business in the past has sold health food products and held seminars on the benefits of particular diets. Thus, although the parties currently may not be selling the same products or services, it appears that in the past they both sold and promoted holistic products and services and disseminated information about healthy living. The abovementioned caption on Defendants' website also suggests to the reader that Defendants are currently in the business of providing goods, services and information about holistic living and wellness. For these reasons, a web surfer looking for whole food products or information about holistic living could access *www.gardenoflife.com* and mistakenly believe that Plaintiff was the source of the information on that website. Therefore, this factor also weighs in favor of a finding of confusion.

c. *Overlapping Marketing Channels.*

■■■■ When both parties use the same marketing channels to advertise and sell their goods, it exacerbates the potential for confusion. *See Brookfield,* 174 F.3d at 1057. Both parties have a presence on the internet. Plaintiff sells its products on its own website and through the websites of authorized distributors. In addition, Plaintiff promotes and sells its products in catalogues, magazines, health food stores and through health care practitioners. Defendants do not appear to currently be selling any products or services (apart from advertising space) on their *www.gardenoflife.com,* and the Court does not have any information about whether Defendants are currently selling products or services through other retail outlets or about outlets through which Defendants

may have previously sold and promoted their products. However, it is doubtful that before February 2004, Defendants promoted or sold their products on the internet because Plaintiff does not contend that any other website pre-dated *www.gardenoflife.com,* and *www.gardenoflife.com* became active for the first time in February 2004. Because the Court does not have any evidence that the parties are or have been using the same marketing channels to promote and sell their products, this factor does not weigh in favor of confusion.

d. *Evidence of Actual Confusion.*

■■■■ Plaintiff has presented substantial evidence that many of its customers have actually mistaken *www.gardenoflife.com* to be Plaintiff's website. For example, between late February 2004 and late March 2004, *www.gardenoflife.com* contained a message board that permitted web users visiting the site to post comments and ask for advice. *See Stone Decl., Exh. 2.* Plaintiff has provided the Court with copies of at least 16 messages posted to Defendants' message board that clearly were intended for Plaintiff. Many of these messages asked for information or advice about how to purchase or take the dietary supplements that Plaintiff sells. Other messages inquired about purchasing a copy of "The Maker's Diet." And one message asked about coconut oils. *Id.* at 10, 11, 14, 15, 18, 19, 22, 23, 24, 25, 27, 28, 29, 30, 32, 33. In addition, in one message, a web user actually expressed confusion as to whether she was on the correct website. *Id.* at 21 ("I'm a bit confused. Is this the right place for health products and green foods? Are you the manufacturers of primal defense etc?"). In another message, a web-user points out that no one has responded to her previous inquiry. *Id.* at 29 ("I would like to order some of your remedies for chroms [sic] disease. My nephew has it

and is very skinny. This is the second e-mail I have sent. I have not heard from you.")

In addition to message board postings, Plaintiff has provided a copy of an e-mail written by Barry Letzer to an investigator working for Plaintiff but posing as an individual interested in purchasing goods from Defendants. In the e-mail, dated March 11, 2004, Barry Letzer states: "I'm so sorry, I had almost deleted [your] e-mail as we get so very many e-mails everyday from the 'other' companies [sic] and I just naturally thought this was one of the hundreds we get every week." *See Powers Reply Decl., Exh. B.* Finally, Plaintiff's vice president of marketing states in her declaration that two publishers, Whole Foods Magazine and Organic Style Magazine, both of whom have business relationships with Plaintiff, mistakenly set up links from their websites to *www.gardenoflife.com. See Burger Decl.* ¶ 10. After Plaintiff contacted the magazines, they reset their links to Plaintiff's website. This evidence is sufficient to establish that actual confusion is occurring.

### e. *The Likelihood of Expansion of the Product Lines.*

 "A strong possibility that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *AMF*, 599 F.2d at 354. When the two companies already compete to a significant extent, this factor is of minimal importance. *See Brookfield*, 174 F.3d at 1060. Because neither party has proffered evidence that Defendants are currently selling any products or services, the Court cannot conclude that the companies currently compete to a significant extent. However, both parties appeal to the holistic health market and Plaintiff contends that in addition to selling dietary supplements, since June 2001, it has also been using its mark to provide information on health, nutrition, fitness and diet. *See Burger Decl.* ¶ 5. Plaintiff has even applied for trademark protection of its mark in those fields. *Id.* These are the same fields in which Defendants claim to have previously done business and the fields that the information on *www.gardenoflife.com* suggests that Defendants will conduct business in once again. Therefore, it appears that the parties may expand their businesses to compete more directly with each other. This increases the likelihood of confusion.

### f. *Defendants' Intent in Selecting the Mark.*

 "When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *AMF*, 599 F.2d at 354. However, this factor is of minimal importance and there is no requirement that the defendant actually intend to confuse customers. *See GoTo.com*, 202 F.3d at 1208.

 Defendants registered the domain name *www.gardenoflife.com* in 1997, three years before Plaintiff even existed. Therefore, Defendants could not have registered the domain name with a bad faith intent to confuse Plaintiff's customers. However, Defendants did not actually launch a website at that domain name until after they became aware of Plaintiff's existence, and after Plaintiff turned down their offer to sell the domain name for $3.9 million dollars. In addition, there is no evidence that between the time that Defendants acquired the domain name in 1997 and the time they began using it in February 2004, they invested any money in it. *Cf. Brookfield*, 174 F.3d at 1059 (finding that the intent factor was indeterminate because although the defendant registered the contested domain name be-

fore it knew about the plaintiff's right in the mark, it launched the website only after learning of Plaintiff's right, and in the meantime it had invested a considerable amount of money in the website). For these reasons, and for the reasons explained in the section above regarding ACPA, Defendants were likely to have had a bad faith intent when they began using the domain name *www.gardenoflife.com.*

### g. *The Strength of the Mark.*

■■■■■ "The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark law." *GoTo.com,* 202 F.3d at 1207. There are four general categories of marks, listed from strongest to weakest: (1) arbitrary or fanciful marks; (2) suggestive marks; (3) descriptive marks; and (4) generic marks. Plaintiff does not argue that its mark fits into any particular category, but simply contends that its mark is strong, based on its four years of doing business, the $6,000,000 that it has spent promoting products under its mark, its success as a business (it has grossed more than $40,000,000 since its inception in 2000), its diverse marketing channels and the best-selling status of its founder's book. Even if Plaintiff's mark is not arbitrary or fanciful, and thus not inherently distinctive, these facts are sufficient to establish that Plaintiff's mark does have strength. *See* J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 15:5 (4th ed.2003) (hereinafter "McCarthy"). Therefore, Plaintiff's mark is entitled to a high level of protection.

### h. *The Type of Goods and Degree of Purchaser Care.*

■■■■ When goods are expensive, buyers can be expected to exercise greater care in their purchases, and therefore confusion as to the source of the goods is less likely to occur. *See AMF,* 599 F.2d at 353. Neither party has presented any evidence regarding the costs or quality of either party's goods or services, and therefore the Court cannot determine the probable level of customer care.

For all of these reasons, Plaintiff has established that due to Defendants' ownership of *www.gardenoflife.com* and their use of Plaintiff's mark on that website, it is likely that Plaintiffs customers have been and will continue to be confused as to the source of Plaintiff's goods. Therefore, Plaintiff has established a likelihood of success on its trademark infringement claim.

### 4. *Plaintiff Has Established Irreparable Injury.*

Although irreparable injury is presumed in trademark infringement cases upon a showing of a likelihood of confusion, it is not clear from the limited caselaw on ACPA whether irreparable injury is also presumed from a finding of an ACPA violation. Therefore, the Court will address whether Plaintiff has succeeded in showing that it will suffer irreparable injury.

■■■■ Plaintiff contends that it has suffered, and will continue to suffer, irreparable injury unless Defendants are enjoined as described in its proposed order because its customers are confused as to the relationship between Plaintiff and Defendants, its customers who attempt to communicate with Plaintiff via Defendants' message board are unable reach Plaintiff, Plaintiff's customers are unable to find its website due to the large number of confusingly similar domain names, and the disparaging comments on *www.gardenoflife.com* as well as the website's promotion of products (such as diet pills and sleeping pills) that are antithetical to Plaintiff's brand are destroying Plaintiff's good will. Defendants do not argue that they will be harmed irreparably if enjoined in the manner pro-

posed by Plaintiff pending a final judgment in this case. Nor do Defendants argue that the balance of hardships tips in their favor. In fact, it is unlikely that Defendants would be materially harmed by having to take down their websites pending judgment in this case because Defendants do not appear to be conducting any genuine business on their websites (apart from offering advertising space and generating referral fees). For these reasons, the Court finds that Plaintiff has established that it will be irreparably injured unless Defendants are enjoined and that the balance of hardships tips in its favor.

### C. *The Scope of Preliminary Injunctive Relief.*

At the hearing on this motion, the Court ordered the parties to meet and confer and to stipulate, to the extent possible, to the language and scope of a preliminary injunction. If after meeting and conferring, the parties are unable to reach a stipulation, or are able to reach only a partial stipulation, they shall jointly file the proposed injunction they do agree about and each side shall also file a revised proposed preliminary injunction containing its own proposed terms. The parties shall file the stipulated proposed injunction and any separate, revised proposed injunctions by not later than Thursday, May 13, 2004 at 9 a.m.

At the hearing, the Court also explained why it is not inclined to order Defendants to transfer to Plaintiff any of the offending domain names. Rather, the Court explained, it is inclined to permit Defendants to continue using the *www.gardenoflife.com* domain name if they use the website in a non-infringing manner, if they post a disclaimer on the website that prominently and clearly explains that they are not affiliated with Plaintiff and if the website provides a link to Plaintiff's website. The Court is also likely to order Defendants to remove all content from their other 74 websites (not including any domain names that incorporate the phrase "Garden of Life Lessons") and replace the content with "under construction" signs.

At the hearing, Plaintiff expressed concern that in the absence of a provisional Court-ordered transfer of the domain names, Defendants may fail to renew the domain names or may transfer them to a third party, thus depriving Plaintiff of the practical benefit of the relief it seeks and precluding the Court from later ordering transfer as part of a permanent decree. In order to address this concern, the Court advises the parties to agree that Defendants would provisionally transfer the domain names to Plaintiff so long as Plaintiff agrees to post "under construction" signs on the websites, to pay any renewal fees that come due before a final judgment in this case is rendered, and not to otherwise use the websites.

The Court intends to impose a bond. The amount of the bond will be commensurate with the breadth of the provisional relief agreed to by the parties or ordered by the Court.

IT IS SO ORDERED.